Howard FINE, Oakhill South Corporation, Eugene Vanderford, Dr. Charles Yates, and John V. Yates, Plaintiffs–Appellants,

v.

AMERICAN SOLAR KING CORP., et al., Defendants,

Main Hurdman, Defendant–Appellee.

James RANDALL, Plaintiff–Appellant,

v.

Brian D. PARDO, et al., Defendants,

Main Hurdman, Defendant–Appellee.

Nos. 89–1218, 89–1290.

United States Court of Appeals, Fifth Circuit.

Dec. 4, 1990.

Terrell W. Oxford, Susman, Godfrey & McGowan, Dallas, Tex., Daniel L. Berger, Bernstein, Litowitz, Berger & Grossmann, New York City, for plaintiffs-appellants in 89–1218.

Stephen Rackow Kaye, James F. Parver, Steven Altman, John W. Ritchie, New York City, Marvin S. Sloman, Dallas, Tex., for Hurdman.

Roger W. Kirby, Lubna M. Farugi, Kaufman, Malchman, Kaufmann & Kirby, New York City, Daniel J. Sheehan, Jr., Sheehan, Young, Smith & Culp, Terrell W. Oxford, Susman, Godfrey & McGowan, Dallas, Tex., for plaintiff–appellant in 89–1290.

Before KING, JOHNSON and WILLIAMS, Circuit Judges.

KING, Circuit Judge:

Plaintiffs–appellants (Plaintiffs) allege that the accounting firm of Main Hurdman violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder by issuing a materially false and misleading qualified report on American Solar King's (ASK) financial statement for fiscal year 1982. The district court found that the Plaintiffs failed to raise a genuine issue of material fact on the elements of scienter and reliance and granted summary judgment in favor of Main Hurdman. We reverse.

## I. BACKGROUND

ASK manufactured collectors for the solar heating of water, and sold groups of such collectors, with associated circulatory equipment and control devices, through a network of distributors for use in the residential solar energy market. In fiscal year 1982, ASK entered the industrial solar energy market, which involved the sale of larger arrays of the same kind of solar collectors to apartment complexes and other industrial users. Under ASK's industrial sales program, the user did not actually buy the system but guaranteed to pay for energy used, up to a maximum of eighty percent of prior fuel costs. The system was sold to a tax-shelter, limited partnership. The first sale was to S.E.P. No. 1 for use by a Wisconsin meat packer (Provimi) and had a sale price of $1,750,000. The partnership paid for the system with $20,000 cash, a short-term note for $905,000, and a long-term, ten-year note at ten percent interest. ASK entered the transaction the day prior to the end of its 1982 fiscal year.

In order to secure the Provimi sale in fiscal year 1982, ASK's own officers and directors purchased about thirty-five percent of S.E.P. No. 1's partnership interests. As a result of the Provimi sale, ASK recognized $1,239,000 of revenue and $964,000 of profits from the Provimi transaction in its 1982 financial statements. With this sale, ASK reported a profit for its fourth quarter and only a small loss for the year as a whole; without this sale, they would have reported a highly unprofitable year.

The Plaintiffs allege that ASK engaged in a fraudulent scheme to overstate its financial statements for fiscal year 1982, and that the Plaintiffs purchased ASK's common stock at artificially inflated prices as a result. Specifically, the Plaintiffs allege that ASK's financial statement for fiscal year 1982 was false and misleading because it:

(1) Improperly recognized revenue from the Provimi sale;

(2) Failed to discount a below market-rate note received in payment for the Provimi system;

(3) Failed to reserve sufficient funds for uncollectible accounts; and

(4) Improperly recognized revenue from sales to Solar Heating, Inc. (Solar Heating), a company under ASK's control.

Main Hurdman violated § 10(b) and Rule 10b–5, the Plaintiffs allege, by issuing a materially false auditor's opinion on ASK's inflated 1982 financial statements. They claim that Main Hurdman's opinion was materially false because:

(1) Main Hurdman incorrectly represented, subject to qualification, that ASK's 1982 financial statements were prepared in conformity with Generally Accepted Accounting Principles (GAAP);

(2) Main Hurdman falsely qualified its opinion by stating that it was "unable to determine the adequacy of the provision for uncollectible accounts," when it knew that the provision for uncollectible accounts was inadequate by at least $200,000 to $300,000; and

(3) Main Hurdman falsely stated that it conducted its audit in accordance with Generally Accepted Auditing Standards (GAAS).

This appeal combines class action suits by purchasers of ASK's common stock during 1982 and 1983. The plaintiffs in *Fine v. American Solar King* (Fine Plaintiffs), No. 89–1218, consist of purchasers of ASK's common stock from October 28, 1982 (the date on which ASK filed its 1982 Form 10–K containing the allegedly false financial statements) through October 27,

1983 (the date ASK announced that it was changing its accounting policies). The plaintiffs in *Randall v. American Solar King* (Randall Plaintiffs), No. 89–1290, purchased stock from July 8, 1982 to December 29, 1983.

The Fine and Randall Plaintiffs both allege similar violations against ASK; ASK's president, Brian Pardo; ASK's former vice-president for finance, David Redding; and ASK's former accountants, Main Hurdman. These defendants, they assert, violated Rule 10b–5, both as primary violators and as aiders and abetters. The Plaintiffs also assert pendent state law claims of fraud and negligent misrepresentation. The Plaintiffs base their allegations against Main Hurdman largely on Main Hurdman's qualified report on ASK's financial statements for fiscal year 1982. The Randall Plaintiffs also allege that Main Hurdman aided and abetted violations committed by ASK with respect to certain unaudited financial reports and other announcements issued by ASK in fiscal year 1983.

In order to prove a violation under Rule 10b–5, a plaintiff must show:

(1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device.

*Warren v. Reserve Fund Inc.*, 728 F.2d 741, 744 (5th Cir.1984). Summary judgment in favor of Main Hurdman was proper if the Plaintiffs' summary judgment evidence failed to raise a genuine issue of material fact on any of these elements.

The district court concluded that the Plaintiffs failed to raise a genuine issue of material fact on the elements of scienter and reliance and granted summary judgment in favor of Main Hurdman, dismissed the pendent state law claims without prejudice, and administratively closed both cases because the defendants, other than Main

Hurdman, were in bankruptcy. The Plaintiffs appeal from the district court's grants of summary judgment in favor of Main Hurdman and its orders administratively closing the cases against the other defendants. We reverse the district court's grants of summary judgment and vacate and remand the district court's orders administratively closing the cases.

## II. MAIN HURDMAN'S LIABILITY AS A PRIMARY VIOLATOR

### A. Scienter

The Plaintiffs allege that Main Hurdman acted with intent to deceive, or severe recklessness, when it issued its qualified auditor's report on ASK's financial statements for fiscal year 1982. Main Hurdman, they argue, knew that ASK improperly recognized revenue from the Provimi sale and from sales to Solar Heating, a company that ASK controlled. They allege that Main Hurdman approved the accounting for these sales in order to benefit certain of Main Hurdman's clients who invested in S.E.P. No. 1 and in order to keep ASK as a client. The Plaintiffs also argue that Main Hurdman knew that its qualification of its report, which stated that Main Hurdman could not determine the adequacy of ASK's reserve for uncollectible accounts, was false because ASK knew that the reserve was inadequate by at least $200,000 to $300,000.

The Plaintiffs observe that Main Hurdman examined the Provimi transaction both before and during their audit. A Main Hurdman planning memo stated:

This transaction must be looked at closely to determine if it was indeed a sale, if the notes carried by ASK are at fair values or if any related parties are involved.... Due to small anticipated net income per books we need to be concerned that the client has done anything possible to record income.

The Plaintiffs argue that, despite these reservations, Main Hurdman approved ASK's accounting for the Provimi sale and that Main Hurdman knew, or should have

known, that ASK's accounting for the Provimi sale violated GAAP.

The Plaintiffs' expert testified that revenue may be recognized under GAAP only when the earnings process is virtually complete and an exchange has taken place. At the end of ASK's fiscal year, however, the Provimi system had not yet been constructed or shipped to the buyer and ASK retained material maintenance and warranty obligations. GAAP also provides that revenue should not be recognized when the seller retains material obligations, or if uncertainties exist with respect to the sale. Significant uncertainties existed, the Plaintiffs' expert opined, concerning whether ASK could install the system by the end of the year as required by their contract.

GAAP also provides that the profit on a sale should not be recognized if collection of the sale price is not reasonably assured. The Plaintiffs argue that Main Hurdman knew that the transaction required completion of a working system, and also knew that the solar panels themselves had not been shipped by ASK to S.E.P. No. 1 or Provimi at year end. Main Hurdman also was aware, the Plaintiffs assert, that interest and principal on the ten-year note was to be paid from payments by Provimi for the energy actually used and would negatively amortize if such payments were inadequate. No evidence existed, the Plaintiffs argue, that the system would ever generate energy sufficient to make the payments on this note. Nor could ASK have been reasonably assured that the individual partners would be able to make up any shortfall on the note after ten or more years.

Main Hurdman argues that ASK's recognition of the Provimi sale conformed with GAAP and that Main Hurdman's conduct negated any intent to deceive. They observe that ASK disclosed the facts concerning the Provimi sale in its 1982 financial statements. They also note that Main Hurdman indicated that the sale, as originally structured, could not be recognized in fiscal year 1982. ASK restructured the sale's terms to include full transfer of title to the solar equipment, and transfer of risk of loss, delay, and other matters during the installation process, to the purchaser by the end of the fiscal year. Subsequent installation was to be supervised by ASK as agent for, and at the risk of, the purchaser. Main Hurdman also presented evidence that S.E.P. No. 1 paid for an uninstalled system and that the cost of installation was not recognized in 1982. Collection of the notes, Main Hurdman argues, was reasonably assured because they were secured by the solar energy equipment, by the personal worth of S.E.P. No. 1's general partner, and by the individual partner's notes, due unconditionally, for their pro rata share.

The Plaintiffs also allege that ASK's accounting for the long-term note violated GAAP. GAAP requires the evaluation of the reasonableness of the interest rate on a note that is received as consideration for the sale of goods. If the note bears an unreasonably low interest rate, the purchase price must be deemed to include a portion of the interest and the actual face amount of the note must be discounted. The long-term note carried a ten percent rate of interest at a time when the prime rate was fifteen and one-half percent. The Plaintiffs argue that because S.E.P. No. 1 had no credit history, and no assets or security, it could not have obtained even a prime rate loan in the open market. The Plaintiffs argue that Main Hurdman knew, therefore, that the ten-percent rate was below market and was prima facie unreasonable.

Main Hurdman argues that the terms of the note were disclosed in ASK's financial statement and that it determined that the interest rate was reasonable because rates had been falling sharply during the year before the note was executed and were expected to continue to decline. The Plaintiffs, on the other hand, observe that Accounting Principles Board Opinion No. 21 specifically provides that considerations of subsequent changes to interest rates are to be ignored and the interest rate must be evaluated at the time the note is issued.

The Plaintiffs also allege that ASK inflated its revenue for fiscal year 1982 by entering into improper transactions with

Solar Heating. Solar Heating had been a large customer of ASK, but could not pay for goods previously purchased. ASK acquired irrevocable proxies for all of Solar Heating's stock, replaced the company's directors and officers with officers of ASK, and continued to sell to Solar Heating. The Plaintiffs assert that a combined financial statement should have been issued for Solar Heating and ASK and that the intercompany sales should have been eliminated from ASK's financial statements. Even if a combined statement was not required, the Plaintiffs argue, a significant reserve should have been set aside for the possibility that Solar Heating might never make payment.

Main Hurdman argues that it determined that the control of Solar Heating was likely to be temporary and that GAAP does not require consolidation of financial statements in such instances. Control by ASK, they noted, was only until Solar Heating paid its debt to ASK, although no fixed date existed for termination of such control. The Plaintiffs, on the other hand, argue that ASK had no assurance of when, if ever, Solar Heating would be able to pay its debt, and the Plaintiffs observe that the debt was increasing because of continued sales to Solar Heating. ASK's control of Solar Heating, they argue, should have been considered indefinite rather than temporary.

The Plaintiffs' expert also opined that Main Hurdman should have realized that ASK's financial statement departed from the GAAP of conservatism, which requires that all possible errors in financial statements be in the direction of understatement rather than overstatement of net income and net assets. He also opined that Main Hurdman departed from the GAAP that requires that transactions be recorded in accordance with economic reality when the form of the transaction differs from its substance.

The Plaintiffs argue that Main Hurdman knew, or should have known, that its statement that ASK's financial statement was in accordance with GAAP was false. They also argue that Main Hurdman knew that its qualifying statement was false. Main Hurdman's qualifying paragraph stated:

> While management is of the opinion that the allowance for doubtful trade accounts and notes receivable is adequate at July 31, 1982, we [Main Hurdman] are unable to determine the adequacy of the provision for uncollectible accounts.

The Plaintiffs argue that Main Hurdman knew that the account was inadequate and provided this statement because ASK adamantly refused to adjust the account and because Main Hurdman did not wish to lose ASK as a client. Main Hurdman, on the other hand, argues that they could not reasonably estimate an adequate reserve.

An audit memorandum by Main Hurdman's audit manager indicates that he believed that ASK's reserve for doubtful accounts should have been increased by at least $200,000 to $300,000. He stated that because

> the client had a bad year they would not even consider the possibility of an adjustment of that size [$200,000 to $300,000]. Therefore, it was decided after several discussions with the client that a qualified opinion would be issued in regard to the A/R [accounts receivable] issue. Since we knew that we were going to qualify as to receivables, all work on W/Ps [workpapers] listed above was stopped as it would be very time consuming and was no longer necessary in light of the qualified opinion.

The Plaintiffs assert that this memorandum indicates that Main Hurdman either knew that the account was inadequate or purposely avoided determining the adequacy of that account.

■ A plaintiff may prove scienter by showing that the defendant acted with an intent to deceive, manipulate or defraud, or by showing that the defendant acted with severe recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668 (1976); *Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir.1987). We have defined severe recklessness as

> limited to those highly unreasonable omissions or misrepresentations that in-

volve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* at 889.

The district court concluded that the Plaintiffs' evidence did not raise a triable issue on scienter because their evidence could not reasonably be construed as indicating that Main Hurdman departed from the standards of ordinary care.

■ A reasonable jury, however, could infer from the Plaintiffs' evidence that Main Hurdman knew that its statements were false when it indicated that ASK's financial statements complied with GAAP, and when it stated that ASK's financial statements fairly represented ASK's financial position. Main Hurdman, as evidenced by their own audit working papers, formed an opinion that the provision for uncollectible accounts was inadequate by at least $200,000 to $300,000. In fact, Main Hurdman admits that their "audit team could not accept ASK's position that the existing reserve was adequate...." The only uncertainty, it appears, was on the exact amount by which the account was inadequate. Main Hurdman, we observe, states that their engagement partner "believed that an adequate reserve might be substantially more than the $200,000—$300,000 range noted in the work papers by his subordinate." Even assuming that Main Hurdman's statement that it was "unable to determine the adequacy of the provision for uncollectible accounts" was true, "a conscious purpose to avoid learning the truthfulness of a statement is an extreme departure from the standards of ordinary care." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 962 (5th Cir.1981). The Plaintiffs' evidence, we conclude, creates a triable issue whether Main Hurdman knew that its qualification was false, or whether Main Hurdman consciously avoided learning the truthfulness of its qualification.

■ Main Hurdman's qualification also was misleading, the Plaintiffs' expert opined, because Main Hurdman failed to disclose that ASK's financial statements were materially affected by ASK's improper revenue recognition from the Provimi and Solar Heating sales, although Main Hurdman must have known that the accounting for these transactions was improper. We note that this evidence is circumstantial, but we have recognized that proof of scienter "will often be inferential" and "circumstantial." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 546–47 (5th Cir.1981), *reversed in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

Main Hurdman argues that the disagreement between the Plaintiffs' expert and their accountants indicates at most a difference of professional judgment concerning the application of GAAP, and that such a dispute does not raise a triable issue concerning scienter. *See Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir.1988) ("an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement."). In *Godchaux*, we observed that GAAP tolerates a wide range of acceptable procedures, and we concluded that in reviewing an accountant's conduct a district court may determine only whether an accountant has chosen a procedure from within that universe of acceptable practices. *Id.* at 315. Our rule in *Godchaux* does not assist Main Hurdman, however, because the Plaintiffs' expert unequivocally testified that Main Hurdman's accounting of ASK's 1982 financial statements could not be included within the universe of acceptable practices under GAAP, and his testimony suffices to create a triable issue on that question.

■ We agree that the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information.

Main Hurdman does not argue that it did not know that ASK's reserve should have been increased. Rather, Main Hurdman argues that such knowledge did not establish scienter because, in order to establish scienter, it must have known that the omitted fact created a "danger of misleading buyers" or the danger must have been "so obvious that the [defendant] must have been aware of it." *S.E.C. v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 n. 17 (5th Cir.1980). Main Hurdman confuses the requirements of knowledge and severe recklessness.

The court in *Southwest Coal* considered whether severe recklessness could be inferred from a party's failure to disclose material facts, and the court concluded that knowledge of an omitted fact, in itself, does not constitute such recklessness unless the party also knows that its failure to disclose the fact could mislead buyers. *Id.* Nothing in the *Southwest Coal* court's opinion, however, indicates that scienter cannot be satisfied by demonstrating that a party knows that it is issuing a materially false statement. The Plaintiffs in the instant case do not allege that Main Hurdman was severely reckless by omitting certain facts. They assert that Main Hurdman's qualification was itself materially false and that Main Hurdman either knew that it was false or was severely reckless in not determining its truthfulness.

█ Even were we to accept Main Hurdman's argument that the Plaintiffs must show that Main Hurdman knew the statement was misleading as well as false, we would have to conclude that the danger of misleading the public through a public accountant's knowing issuance of a false opinion is obvious. A public accountant performs an important public function and must be aware that the public places great faith in the probity of its opinions.

The Plaintiffs also adduced evidence of an improper motive that, if believed, suggests that Main Hurdman assisted ASK in a scheme to mislead the public by inflating ASK's revenues. The Plaintiffs observe, for example, that several of the investors in S.E.P. No. 1 were Main Hurdman's

clients, and the Plaintiffs suggest that Main Hurdman approved ASK's accounting of the Provimi sale to ensure that these clients received tax advantages from the Provimi sale. The Plaintiffs also argue that Main Hurdman may have been motivated, in part, by a desire to keep ASK as its client. The Plaintiffs' evidence and speculation as to motive, in itself, does not suffice to create a triable issue on scienter. We have noted, however, that summary judgment should be used sparingly when motive and intent are factors. *Whitaker v. Coleman*, 115 F.2d 305, 306 (5th Cir.1940); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979); *see also* 6 *Moore's Federal Practice* ¶ 56.15(4) at pp. 56–295 (2d ed. 1986) (discussing propriety of summary judgment when credibility is an issue).

█ We agree with Main Hurdman that a "mere scintilla of evidence in support of plaintiff's position will be insufficient" to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). We must view the evidence and draw all inferences, however, in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A reasonable jury, we conclude, might believe the Plaintiffs' expert and find that Main Hurdman knew that it was issuing a false and misleading report, or that it was severely reckless in issuing its report. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### B. Reliance

█ The district court asserted, and the parties do not dispute, that the fraud on the market theory, which creates a rebuttable presumption of reliance, controls the issue of reliance in this case. The district court found that Main Hurdman rebutted the presumption of reliance, however, because the deposition testimony, read as a whole, indicated that the named Plaintiffs did not rely on Main Hurdman's report on ASK's 1982 financial statements. Under the fraud on the market theory, however,

misleading statements defraud purchasers of stock even if the purchasers do not rely directly on such misstatements. *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988). The Supreme Court in *Basic* observed:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business ... *Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements....*

*Id.* (emphasis added) (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3rd Cir.1986)). The court presumes that the plaintiff relied not on the defendant's fraudulent statements directly, but on the market's reflection of those fraudulent statements in the value of the stock. *Peil v. Speiser*, 806 F.2d 1154 (3rd Cir.1986).

█ Main Hurdman could rebut the presumption of reliance by "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248, 108 S.Ct. at 992. The presumption of reliance can be rebutted by showing: (1) that the nondisclosures did not affect the market price, or (2) that the Plaintiffs would have purchased the stock at the same price had they known the information that was not disclosed; or (3) that the Plaintiffs actually knew the information that was not disclosed to the market. *Id.* at 248–49, 108 S.Ct. at 992–93; *Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 365 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988), citing *Peil v. Speiser*, 806 F.2d 1154, 1163 (3rd Cir.1986), and *Blackie v. Barrack*, 524 F.2d 891, 906–07 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). Main Hurdman argues that it rebutted the presumption of reliance by proving that the named Plaintiffs did not rely on the market price of the stock or on Main Hurdman's 1982 report, but rather relied on other specific information with which Main Hurdman had no connection.

█ Under the fraud on the market theory, however, the Plaintiffs did not need to show that they actually relied on Main Hurdman's report rather than on other materials. Main Hurdman had the burden of showing that the Plaintiffs knew of the omitted or misstated facts, or that they would have traded at the same price had they known. They offered no such evidence. The evidence upon which Main Hurdman relies demonstrates only that the named Plaintiffs had their own investment strategies and motives in purchasing ASK's stock. Main Hurdman did not offer evidence that these Plaintiffs would have purchased ASK's stock at the same price had they known, for example, that ASK's provision for uncollectible accounts was understated by several hundreds of thousands of dollars. Even if the Plaintiffs relied on interim reports and revenue projections issued after ASK's 1982 financial statements, as Main Hurdman suggests, this fact does not negate their reliance on the market or on ASK's 1982 financial statements.

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentation, therefore, may be presumed for purposes of a Rule 10b–5 action.

*Basic*, 485 U.S. at 247, 108 S.Ct. at 991–92. We conclude, therefore, that Main Hurdman did not sever the link between the market price and the investment decision.

█ Even without the fraud on the market presumption, the Plaintiffs appear to have raised a genuine issue of material fact on the issue of reliance. In their depositions, each of the named Plaintiffs testified that they relied, at least to some extent, on Main Hurdman's opinion. Plaintiff Fine, for example, testified unequivocally that Main Hurdman's opinion was a factor in his decision to purchase thirty-two shares of ASK stock on February 3, 1983

and two-hundred shares of ASK stock on July 28, 1983.

The district court acknowledged that "[w]hile more than one Plaintiff states a conclusion that he relied on the report, the whole of each Plaintiffs' deposition testimony clearly indicates the contrary." Perhaps the district court objected to these Plaintiffs' testimony because they stated conclusions. A witness' conclusory opinion on his subjective state of mind, however, is admissible and perhaps inevitable. *United States v. Dozier*, 672 F.2d 531, 542–43 & n. 7 (5th Cir.), *cert. denied*, 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). Or perhaps the district court simply did not agree with these Plaintiffs' conclusions. In reviewing the record on a motion for summary judgment, however, we must draw all inferences most favorable to the party opposing the motion and all doubt as to the existence of a genuine issue of material fact must be resolved in the nonmovant's favor. *Southern Distributing Co., Inc. v. Southdown, Inc.*, 574 F.2d 824 (5th Cir. 1978); *United States Steel Corp. v. Darby*, 516 F.2d 961 (5th Cir.1975). Even if the fraud on the market theory did not apply to this case, therefore, we would have difficulty in concluding that the Plaintiffs' evidence, viewed in the light most favorable to the Plaintiffs, and drawing all inferences most favorable to them, failed to raise a genuine issue of material fact on the question of reliance.

### III. MAIN HURDMAN'S LIABILITY AS AN AIDER AND ABETTOR

The district court in both cases dismissed the Plaintiffs' claims against Main Hurdman, both as a primary violator and as an aider and abettor, based on Main Hurdman's qualified report on ASK's 1982 financial statements. The Randall Plaintiffs, however, also claimed that Main Hurdman aided and abetted violations committed by ASK through its issuance of certain unaudited 1983 reports and other announcements. The district court concluded that Main Hurdman was not liable as an aider and abettor based on these 1983 reports because Main Hurdman was not generally aware of its improper role in a securities violation by a primary party and did not knowingly render substantial assistance in such a violation.

In order to establish a claim for aiding and abetting, the plaintiff must demonstrate: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1126 (5th Cir.1988), *cert. denied as to relevant part sub nom., Abell v. Wright Lindsey & Jennings*, —— U.S. ——, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989), *vacated and remanded as to non-relevant part sub nom., Fryar v. Abell*, —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), citing *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 581 (5th Cir.1988). The Plaintiffs' evidence on scienter, we conclude, sufficed to raise a genuine issue of material fact on whether Main Hurdman was generally aware of its role in a securities violation by a primary party. We also conclude that the Plaintiffs raised a triable issue on whether Main Hurdman knowingly rendered substantial assistance in a securities violation by a primary party. The knowing issuance of a materially misleading qualified opinion, we observe, would have substantially assisted ASK, Pardo, or Redding in committing a securities violation. We must address separately, however, the question of whether the Plaintiffs presented sufficient evidence of a securities violation by a primary party.

In order to prove a violation under Rule 10b–5, a plaintiff must show: (1) a material misrepresentation or omission; (2) a purchase or sale of securities; (3) scienter; (4) justifiable reliance; and (5) damages. *Warren v. Reserve Fund Inc.*, 728 F.2d 741, 744 (5th Cir.1984). The only elements not controlled by our earlier discussion are whether ASK, Pardo, or Redding, rather than Main Hurdman, issued, with scienter, a material misstatement or omission.

■ The Plaintiffs' expert stated unequivocally that ASK's recognition of income from the Provimi sale, and from the sales to Solar Heating, inflated ASK's revenue for 1982 and did not comply with GAAP. Main Hurdman, as well as the Plaintiffs' expert, acknowledged that ASK's $47,000 reserve for uncollectible accounts was insufficient. We find this evidence sufficient to raise a triable issue on whether ASK misrepresented material facts in its 1982 financial reports.

■ In order to avoid summary judgment, the Plaintiffs' evidence also must raise a triable issue on whether ASK, Pardo, or Redding knew that ASK's 1982 financial statements were false, or whether ASK, Pardo, or Redding was severely reckless in issuing those statements. Main Hurdman, we note, informed ASK that its provision for uncollectible accounts was inadequate, and Main Hurdman qualified its report because ASK would not alter that provision. According to Main Hurdman's workpapers, ASK told Main Hurdman that it would not change its provision for uncollectible accounts because it had a bad year and because it was pursuing collection vigorously.

We conclude that this evidence created a triable issue on whether ASK knew that its provision for uncollectible accounts was inadequate. The Plaintiffs also presented evidence from which a reasonable jury could conclude that ASK knew that its recognition of revenue from the Provimi and Solar Heating transactions was improper. We find, therefore, that the Plaintiffs presented sufficient evidence to avoid summary judgment on their claims that Main Hurdman aided and abetted a Rule 10b-5 violation by a primary party. Because we find that the Plaintiffs raise a genuine issue of material fact on the question of aiding and abetting based on Main Hurdman's qualified report on ASK's 1982 financial statements, we do not reach the issue of whether the Plaintiffs' also met their burden of preventing summary judgment based on their claims that Main Hurdman aided and abetted violations in fiscal year 1983.

## IV. CLOSING THE CASE AGAINST THE OTHER DEFENDANTS

■ The district court dismissed without prejudice the defendants other than Main Hurdman so that it could remove the case from its docket. The district court noted that these defendants are in bankruptcy and it specifically provided that the Plaintiffs could reopen the case against these defendants should the outcome of their bankruptcy proceedings warrant it. Because the district court will not be able to remove this case from its docket, we vacate and remand for the district court to consider whether, in these circumstances, it remains in the interest of judicial administration to dismiss the defendants other than Main Hurdman.

## V. CONCLUSION

Based on the foregoing, we reverse the district court's grant of summary judgment in favor of Main Hurdman in actions No. 89-1218 and 89-1290, and we vacate and remand in both cases for the district court to consider its decision to close these cases as to the defendants other than Main Hurdman. Costs shall be borne by Main Hurdman.

REVERSED IN PART, VACATED AND REMANDED IN PART.