**MARKSMAN PARTNERS, L.P., et al., Plaintiffs,**

v.

**CHANTAL PHARMACEUTICAL CORP., et al., Defendants.**

**No. CV–96–0872 WJR (RNBX).**

United States District Court, C.D. California.

Feb. 24, 1999.

---

## ORDER
### 1) DENYING CHANTAL PHARMACEUTICAL CORP. AND CHANTAL BURNISON'S MOTION FOR SUMMARY JUDGMENT, 2) DENYING STANSON MARKETING, INC. AND FRED REINSTEIN'S MOTION FOR SUMMARY JUDGMENT, and 3) GRANTING COOPERS & LYBRAND L.L.P.'S MOTION FOR SUMMARY JUDGMENT

REA, District Judge.

On February 22, 1999, the Court heard oral argument regarding three separate motions for summary judgment brought by (1) Chantal Pharmaceutical Corporation ("Chantal") and Chantal Burnison ("Burnison"), (2) Stanson Marketing, Inc. ("Stanson") and Fred Reinstein ("Reinstein"), and (3) Coopers & Lybrand L.L.P. ("C & L"). After oral argument, the Court took each of the motions under submission for further consideration.

The Court now rules in accordance with its tentative ruling that was issued to the parties on February 22, 1999. Thus, the Court hereby denies Chantal and Burnison's, and Stanson and Reinstein's Motions for Summary Judgment as there are genuine issues of material fact relating to the claims against these parties. In addition, the Court hereby grants C & L's Motion for Summary Judgment as there are no genuine issues of material fact relating to the claim against C & L.

### I. Chantal's Motion for Summary Judgment

Defendants Chantal and Burnison argue that Plaintiffs' claim for securities

fraud under Securities Exchange Act § 10(b) and Rule 10b–5 must fail. Defendants claim that Plaintiffs have no evidence of a fraudulent "ship and return" scheme between Chantal and Stanson leading to any illegal "insider trading" by Burnison that can form the basis for the securities fraud claim. Defendants also argue that Plaintiffs have not established that Chantal's 1995 financial statements were fraudulent and misleading due to Stanson's right to return goods under the distribution agreement. Specifically, Defendants maintain that Plaintiffs have no evidence that any goods were "returned" for any amount of credit that is material.

It is undisputed that 62% of Chantal's reported 1995 sales were to Stanson. While Defendants claim that all product returns may have accounted for less than 1% of sales in 1995, Plaintiffs counter that the 1% figure applies only to returns from purchases made through Chantal's 1–800 number. Plaintiffs assert that the returns from Stanson constituted over 60% of the total returns in 1995.

Plaintiffs allege that as a result of millions of dollars of product being returned by Stanson after payment was received, Chantal materially overstated net income by approximately $2.3 million, $0.7 million, and $7.4 million for the fiscal year ending 6/30/95, the third quarter ending 3/31/95, and the first quarter ending 9/30/95, respectively. These overstatements, in turn, caused earnings per share to be overstated by $0.17, $0.05, and $0.41 over the same periods. Thus, this "ship-and-return" scheme artificially boosted Chantal's stock price to an all time high immediately prior to Burnison's 20% share sale of stocks.

Therefore, whether Stanson returned goods for credit, and whether these returns caused Chantal's 1995 financial report to be fraudulent are genuine issues of material fact. Accordingly, summary judgment in favor of Defendants Chantal and Burnison is not appropriate.

## II. Stanson and Reinstein's Motion for Summary Judgment

A. *Plaintiffs Have Sufficiently Established the Misleading Statements Made by the Stanson Defendants*

 The evidence presented to this Court raises genuine questions of material fact as to the following issues: (i) how and when Reinstein told and directly participated in telling analysts and investors that Chantal products were enjoying wide and growing sales and distribution leading to impressive revenues, while he was preparing to sell 50,000 shares of Stanson's Chantal stock; (ii) how Reinstein's statements were made to analyst Gibson who was known to be following Chantal; (iii) whether Gibson actually issued reports based on Reinstein's statements and/or assurances of accuracy of information; (iv) whether Reinstein was present to give credibility as Chantal's distributor when similar statements were made to a gathering of investors and analysts; and (v) whether Reinstein knew his statements or assurances were false, given that most, if not all, of the Chantal product sold to Stanson was simply being held in warehouses, unsold.

B. *The Evidence Also Establishes a Triable Issue on Stanson's and Reinstein's Scienter*

 Scienter is established by " 'proving either actual knowledge or recklessness.' " *Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996) (citation omitted). "Scienter can be established by direct or circumstantial evidence." *Id.*

 Here, the testimony of Carter, Burnison, and Reinstein all serve to raise genuine issues of material fact that Reinstein may have known that his statements to Gibson about the number of stores that would carry or were carrying Ethocyn and the 1996 and 1997 revenues Chantal would earn were false when made.

Reinstein apparently must have known that millions of dollars of Chantal product which Stanson "bought" from Chantal

were simply being stored, not sold, because he signed the checks to pay the warehouse storage bills over a several month period.

In addition, Stanson's receipt of Chantal stock, which was sold to pay for Chantal product, further raises genuine issues of fact regarding scienter in this alleged scheme. The sale of stock was made within weeks of Reinstein's participation in the August presentation to analysts and investors which resulted in Gibson's favorable report.

For the foregoing reasons, the Court denies Defendant Stanson and Reinstein's Motion for Summary Judgment.

## III. Coopers & Lybrand's Motion for Summary Judgment

Defendant C & L argues that the undisputed facts in this case establish as a matter of law that C & L did not act with the requisite degree of scienter essential to maintain a fraud claim against an accounting firm under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. Plaintiffs, on the other hand, argue that C & L acted recklessly with respect to its audit of Chantal such that Plaintiffs can establish scienter. Moreover, Plaintiffs argue that Defendant C & L's audit was so deficient that it amounted to no audit at all.

■ In order to establish liability under section 10(b), plaintiffs must show that the defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *In re Software Toolworks, Inc.,* 50 F.3d 615, 626 (9th Cir.1994). With respect to auditors, the Ninth Circuit has

found that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP [Generally Accepted Accounting Principles], without more, does not establish scienter." *Id.* at 627 (quotations omitted); *see also In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1426 (9th Cir.1994) (citing cases that state "even deliberate violations of [GAAP and GAAS (Generally Accepted Auditing Standards) ], without more, do not amount to fraud.").[1]

■ Plaintiffs must prove that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *Id.* at 628 (quotations omitted). Where a defendant's evidence "indicat[es] that the accounting decisions were reasonable [it] negates the plaintiffs' attempt to establish scienter." *In re Worlds of Wonder,* 35 F.3d at 1426.

■ In addition, Plaintiffs may not rely solely on arguments that Defendant could, and should, have made further inquiries with respect to Chantal's audit to defeat summary judgment. "Plaintiffs' contention that [defendant] should have performed further inquiries and investigations, arguing with the benefit of hindsight, does not establish the audit was reckless." *See Software Toolworks,* 50 F.3d at 627. Moreover, "[f]raud cannot be inferred simply because [a defendant] might have been more curious or con-

---

1. The Court notes that these two Ninth Circuit cases, *Software Toolworks* and *Worlds of Wonder,* served to be particularly helpful in evaluating whether Plaintiffs' evidence was sufficient to defeat C & L's summary judgment motion based on scienter. In each case, the Ninth Circuit found summary judgment to be appropriate in circumstances similar to those of the instant case. In comparison, *Fine v. American Solar King Corp.,* 919 F.2d 290, 296–98 (5th Cir.1990), demonstrated

what evidence would be sufficient to move beyond summary judgment with respect to scienter. As the Ninth Circuit parenthetically noted, *Fine* indicates that a "triable issue regarding scienter exists where plaintiffs directly established that accountants knew they had violated GAAP by issuing false statements[.]" *Worlds of Wonder,* 35 F.3d at 1426 (citing *Fine,* 919 F.2d at 296–98). The evidence presented by Plaintiffs in the instant case is significantly different from that presented *Fine.*

cerned about the activity [in question]." *Chill v. General Electric Co.*, 101 F.3d 263, 270 (2d Cir.1996).

### A. *Substantiation of Chantal's Fiscal 1995 Sales to Stanson*[2]

■ Contrary to Plaintiffs' allegations that C & L essentially did no audit, the evidence demonstrates that C & L conducted numerous auditing procedures. Furthermore, Chantal's June 30, 1995 balances were substantiated by direct reference to third-party documentation. For example, along with other admissions regarding C & L's audit, Plaintiffs admit that:

—C & L observed Chantal's counting of its physical inventory and determined that the $3 million in product sold to Stanson was not in Chantal's warehouse and was not included in Chantal's remaining inventory balance on its books and records after Chantal's 1995 fiscal year end;

—C & L concluded, through this inventory observation and third party evidence, that the $3 million in product sold to Stanson in June 1995 had been shipped by the end of Chantal's 1995 fiscal year and was owned by Stanson;

—C & L received two separately executed written confirmation responses whereby both responses indicated that Stanson confirmed that it owed Chantal approximately $3 million as of June 30, 1995;

—C & L documented in its work papers that C & L examined the sales return allowance regarding possible product defect returns on Chantal's 1995 fiscal year

sales to Stanson and determined that it was reasonable;

—while Chantal did not take a reserve for the 60–day return period, C & L concluded that the 60–day right of return on the $3 million sale had expired by the time Chantal issued its 1995 Form 10–K;

—C & L obtained a fully executed copy of the Stanson Marketing Agreement ("SMA") prior to issuing its audit report and C & L audit manager, Dan DeLeon, testified that he read every paragraph of the SMA;

—Mr. DeLeon discussed the terms of the SMA with both the audit partner, Mr. Hurwitz, and the concurring partner Mr. Schultz, and all three auditors documented their resolution of the SMA in C & L's work papers;

—C & L confirmed a $3 million payment by Stanson through examining a copy of the check and its related bank deposit slip; and

—C & L received a management representation letter from Chantal.

These admissions indicate that, contrary to Plaintiffs' allegations, there is undisputed evidence that Defendant C & L did conduct significant auditing procedures to verify the $3 million Stanson sale at issue.[3] Nevertheless, Plaintiffs argue that C & L should have conducted further inquiries to substantiate their findings. However, this argument is not sufficient to defeat summary judgment as fraud cannot be inferred simply because Defendant C & L might have been more curious or concerned about the activity in question.

2. Plaintiffs also argue that C & L is liable for Chantal's first quarter 1996 Form 10–Q. However, Plaintiffs admit that C & L had no involvement in preparing, or even saw, Chantal's first quarter 1996 Form 10–Q prior to its issuance. Accordingly, C & L cannot be liable as it never issued a public statement about that 1996 Form 10–Q.

3. Plaintiffs also argue that Defendant C & L did not conduct proper cut-off procedures to

determine whether the revenue from the Stanson sale should be recognized in the 1995 fiscal year. The admitted facts cited here also demonstrate that C & L had established that title had passed to Stanson by Chantal's 1995 fiscal year end. Moreover, the evidence shows that C & L's judgment that sales were recorded in the proper period was fully supported by direct observation and third party verification.

### B. *Compliance With FAS* [4] *48*

 To further support their claim that Defendant C & L was reckless, Plaintiffs argue that Chantal's $3 million sale to Stanson was not in compliance with two conditions of FAS 48 such that the revenue from the sale should not have been recognized in fiscal 1995. However, as explained above, violations of GAAP, without more are not sufficient to establish scienter. Therefore, although it is evident that there is a dispute as to whether the revenue should have been recognized under FAS 48, this dispute does not mandate defeat of the instant summary judgment motion. None of the evidence submitted by Plaintiffs supporting these arguments demonstrates that there is anything "more" at issue that would support a finding of scienter on behalf of C & L.

#### 1. *Whether returns could be reasonably estimated*

 Plaintiffs argue that Chantal had no reasonable basis by which to estimate returns from Stanson and, more importantly, that C & L failed to identify this problem.

However, Plaintiffs admit that C & L examined the sales return allowance regarding possible product defect returns on Chantal's 1995 fiscal year sales to Stanson and determined that it was reasonable. Furthermore, Plaintiffs admit that although Chantal did not take a reserve for the 60–day return period, C & L concluded that the 60–day right of return on the $3 million sale had expired by the time Chantal issued its 1995 Form 10–K. In addition, Plaintiffs admit that Mr. DeLeon obtained a fully executed copy of the SMA, read it in its entirety, and discussed its terms with both the audit partner and the concurring partner.

Notwithstanding the admissions regarding C & L's investigation of whether Chantal had reasonable means to estimate returns, Plaintiffs argue that C & L should have, but did not, analyze the put and call options contained in the SMA. However, Defendant C & L has provided the Court with Mr. DeLeon's uncontroverted testimony that upon reading the SMA, he concluded that the options had no impact on the recognition of revenue for 1995 fiscal sales. Mr. DeLeon explained that the option was something that was outside the scope of the audit period and did not impact the sales that had been paid for and not returned by the end of the fiscal period. (DeLeon, 109:6–110:18.) Moreover, Mr. DeLeon explained, and Plaintiffs' admit (Opp. at 9), that the option could not have been exercised until six months after the close of the fiscal year in question.

Even if Defendant C & L should have determined that Chantal had no reasonable means to estimate returns, nothing in the evidence indicates that C & L's decision regarding the matter supports an inference of recklessness on behalf of C & L.

#### 2. *Whether Stanson had economic substance apart from that provided by Chantal*

Plaintiffs argue that Stanson had no economic substance apart from that provided by Chantal and that C & L was reckless because their auditors never analyzed whether Stanson had such economic substance.

Plaintiffs argue that during 1995, Stanson was a shell company with no employees, no owned or leased warehousing space or trucking equipment, and a poor-to-nonexistent accounting system. Notwithstanding whether such allegations are true, the issue raised under FAS 48 is whether Stanson had economic substance apart from Chantal. *See Marksman*, 927

**4.** Generally Accepted Accounting Principles ("GAAP") are the conventions, rules, and procedures that constitute the professional standards of the accounting profession. An accounting procedure that accords with a

Statement of Financial Accounting Standards ("FAS") is by definition a generally accepted accounting principle. *See Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F.Supp. 1297, 1304 (C.D.Cal.1996)

F.Supp. at 1304, n. 2 (noting that FAS 48 "prevents enterprises from recognizing sales revenue on transactions with parties that the *sellers have established* primarily for the purpose of recognizing such sales revenue." (emphasis added)).

Defendant C & L has presented undisputed evidence that Stanson had a separate address, fax, and phone line from Chantal. The individuals who represented Stanson in its dealings with C & L were not employees of Chantal. C & L confirmed the existence of a $3 million check from Stanson that was not returned. Moreover, C & L further confirmed that Stanson was a separate entity from Chantal by getting a representation from Mr. Dworkin that he dealt with Stanson in the past.[5] Even if Stanson was supported by its sister company, Turbo Tek, this fact does not affect C & L's determination that Stanson was separate from Chantal.

Although it is possible that C & L could have done more to investigate Stanson, based on the knowledge that C & L had at the time, their failure to be more curious does not support Plaintiffs' contention that their practices amounted to the recklessness required for fraud allegations.

### C. *Related–Party Relationship*

Plaintiffs argue that Stanson and Chantal were related parties and C & L failed to even investigate whether Stanson was a related party.

Defendant C & L did conduct a related-party analysis. Defendant C & L has submitted an "Audit Strategy and Completion Memorandum" for the fiscal 1995 audit that includes a list of nine parties that were known to be related to Chantal at the time of the audit. Furthermore, Defendant C & L submitted a copy of C & L's Related–Party Transaction audit program for Chantal Pharmaceutical Corporation and for Cyto Skin Care Corporation, which became Chantal Skin Care Corporation, each having notes, initials, and dates verifying when the work was completed.

Plaintiffs dispute that the proper audit steps regarding related-parties were taken by C & L. But in support of their arguments, Plaintiffs first claim that C & L should have identified Stanson as a related party. This argument made with the advantage of hindsight is not sufficient to infer recklessness. Plaintiffs' arguments do not refute the evidence that shows that C & L did conduct a related-party analysis. Moreover, Plaintiffs' allegations do not refute the ample evidence that shows that C & L had a reasonable basis for determining that Stanson had economic substance apart from Chantal and that Stanson was not a related party.[6]

Accordingly, whether C & L would have discovered more relevant information if they had identified Stanson as a related party is irrelevant to the instant analysis. Moreover, C & L's failure to identify Stanson as a related party, even if it was in violation of GAAS, does not indicate that C & L had the requisite scienter to be liable for securities fraud.

### D. *BDO's Independent Findings*

Defendant C & L, to support its claims, refers to the findings of BDO Seidman, LLP ("BDO") an independent group of auditors hired by Chantal to audit its 1996 and 1997 financial statements. As part of its 1997 audit, BDO reaudited Chantal's fiscal 1995 income statement. In doing so, BDO came to the same conclusions as C & L. Specifically, BDO concluded that Chan-

---

5. Although Plaintiffs dispute this fact, they only claim that Defendant C & L did not document whether Mr. Dworkin had dealt with Stanson in the past in accordance with GAAS. Again, a failure to comply with GAAS or GAAP is not sufficient to establish the requisite intent.

6. Without repeating the evidence that supports C & L's findings here, it suffices to say that much of the evidence that C & L relied upon in determining that Stanson had economic substance apart from Chantal was also relied upon to determine that Stanson should not have been identified as a related party.

tal properly recognized revenue from the sales to Stanson in fiscal 1995. In addition, BDO, throughout its work with Chantal, determined that Stanson had economic substance apart from Chantal and Stanson was not a related party. Furthermore, BDO found that the put and call options contained in the SMA did not impact Chantal's recognition of revenue for fiscal 1995 sales.

Plaintiffs argue that BDO's work is irrelevant to this case as the work was performed at a later time such that the relevant circumstances may have changed. Moreover, Plaintiffs argue that BDO, in auditing Chantal's 1995 financial statements, did nothing to investigate the evidence uncovered by this lawsuit even though the lawsuit was already pending.

Notwithstanding any changes in circumstances, the uncontroverted evidence shows that BDO conducted an independent audit and came to the same conclusions as those of C & L. Specifically, BDO's audit partner explicitly stated that, in conducting an audit of Chantal's 1995 fiscal income, he did not rely on any of the work that C & L did for the 1995 audit of Chantal.

The Court need not rely on any of the evidence relating to BDO's audits of Chantal in finding that C & L lacked the requisite scienter as a matter of law. However, the Court makes note of BDO's findings as some of the findings certainly provide further support for the notion that C & L's auditing decisions were reasonable as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court hereby DENIES the Motions for Summary Judgment brought by Chantal Pharmaceutical Corporation and Chantal Burnison, and Stanson Marketing, Inc. and Fred Reinstein. In addition, the Court hereby GRANTS Coopers & Lybrand's Motion for Summary Judgment.

IT IS SO ORDERED.