NCNB NATIONAL BANK OF NORTH CAROLINA, Plaintiff-Appellee v. DELOITTE & TOUCHE, Defendant-Appellant

No. COA94-785

(Filed 6 June 1995)

1. **Accountants § 21 (NCI4th)— negligent misrepresentation—sufficiency of evidence**

Evidence was sufficient to show that the tort of negligent misrepresentation occurred in this case and that plaintiff relied upon financial statements prepared by defendant accountant to its detriment where there was extensive testimony from plaintiff's bankers, defendant's records, and other reports that defendant prepared its client's 1986 audit knowing that the client intended to finance purchase of a competitor through funds borrowed from plaintiff.

**Am Jur 2d, Accountants § 25.**

## 2. Accountants § 20 (NCI4th)— negligent misrepresentation claim—applicable statute of limitations

The trial court properly denied defendant's motions for a directed verdict and a judgment n.o.v. on the grounds that the claims of plaintiff were barred by the applicable statute of limitations and statute of repose, since this was an action for negligent misrepresentation, not malpractice, and the cause of action therefore did not accrue until plaintiff suffered some harm because of the misrepresentation and discovered the misrepresentation, both of which events occurred within three years of plaintiff's filing of the suit.

**Am Jur 2d, Accountants § 29.**

**Application of statute of limitations to actions for breach of duty in performing services of public accountant. 7 ALR5th 852.**

Appeal by defendant from judgment entered 11 May 1993 by Judge Robert P. Johnston in Mecklenburg County Superior Court. Heard in the Court of Appeals 17 April 1995.

*Sumner & Hewes, by Stephen J. Anderson, and Maupin Taylor Ellis & Adams, P.A., by Daniel K. Bryson and Laura Kay W. Berry, for plaintiff-appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by James T. Williams, Jr. and Mack Sperling, for defendant-appellant.*

JOHNSON, Judge.

This is an accountant's liability action brought by plaintiff NCNB National Bank of North Carolina against defendant Deloitte & Touche. Plaintiff sued defendant on 14 September 1989, asserting claims of (1) negligent misrepresentation and (2) breach of the audit contract between defendant and Specialty Retail Concepts, Inc. (SRC), to which plaintiff claimed it was a third party beneficiary. Defendant's motion to dismiss was denied by an order dated 30 January 1990 and defendant's motion for summary judgment was denied by an order dated 8 June 1992. After a jury trial, the court granted defendant's motion for a directed verdict as to plaintiff's contract claim.

The jury returned a verdict on 19 February 1993 in favor of plaintiff on its negligent misrepresentation claim on one of eight loans for which plaintiff had sued. The outstanding balance on that particular loan was $2,921,123.02; the jury awarded that amount as damages, but found that plaintiff could have mitigated damages in the amount of $2,535,324.30. A judgment against defendant in the amount of $385,809.72 was entered on 11 May 1993. Defendant's post-trial motions for a judgment notwithstanding the verdict and a new trial, made on 1 March 1993 and 13 May 1993, were denied by the trial court on 29 December 1993. Defendant gave notice of appeal to our Court.

## THE FACTS

The facts of this case are as follows: SRC was a Winston-Salem based franchising company whose primary business was selling franchises for small, specialty food retail shops usually located in enclosed shopping malls. SRC also wholesaled products to these shops.

Defendant is an accounting firm which served as SRC's auditors from 1981 until 31 July 1987. As was the custom with its clients, an annual oral agreement was the basis for the services defendant provided to SRC.

Plaintiff was SRC's primary bank beginning in 1985. During 1985 and 1986, plaintiff made loans to SRC. Plaintiff relied upon many factors in determining to make loans to SRC, including the quality of SRC's management, SRC's unaudited quarterly financial information, public offering of SRC stock, and SRC's financial projections for the future. Each of the loans to SRC was subject to an approval process which began with Mr. Alan Pike, plaintiff's commercial loan officer in Winston-Salem, and culminated with plaintiff's regional executive and chairman of its regional loan committee. Review of SRC's audited financial statements was required by the loan agreements between plaintiff and SRC and was a substantial part of this approval process. The loan agreements imposing the requirement that SRC was required to provide plaintiff with audited annual financial statements were included by defendant in its permanent SRC audit files and specifically reviewed by defendant's auditors during each audit.

Defendant communicated with plaintiff about the status of SRC loans. For example, at times, SRC did not maintain the level of collateral required by the loan agreements. Before rendering an unqualified opinion regarding SRC's financial statements, defendant would

require assurances from plaintiff that they would not declare loans in default. Defendant asked for, and plaintiff provided, covenant violation waiver letters during both the 1985 and 1986 audits.

The loan on which the jury found defendant liable was a $3.5 million dollar loan from plaintiff to SRC in 1986. The purpose of this loan was to enable SRC to purchase assets of a competitor, Jo-Ann's Nuthouse (Jo-Ann's). This loan was more than three times the size of any other loan made to SRC by plaintiff.

SRC first approached plaintiff about the Jo-Ann's loan in May 1986, just before the 31 May end of SRC's fiscal year, as the 1986 audit was being planned by defendant. The seller, Jo-Ann's, had requested assurance that SRC would be able financially to purchase the assets. Although SRC initially contemplated and discussed a public stock offering, the company only approached plaintiff about financing.

In May 1986, SRC asked plaintiff for a commitment letter regarding the loan. At this point, plaintiff had received only interim, unaudited 1986 financial information from SRC, which showed substantially increased profits. Plaintiff reviewed and relied on this information, but SRC understood that funding the loan was contingent on independent verification by defendant, through an audit of SRC's 1986 financial performance. Plaintiff's loan officer, plaintiff's city executive, and SRC's president all testified to this.

Plaintiff proposed a commitment letter. A draft of the letter provided expressly that the loan would not be funded until plaintiff received SRC's audited 1986 financial statements. SRC believed that Jo-Ann's would not be satisfied with that contingency and asked plaintiff to delete it. In its place, plaintiff inserted the following language: "Funding of the term loan is subject to our negotiation of a satisfactory Loan Agreement covering all borrowings. We expect such a Loan Agreement to closely follow covenants already in the existing Loan Agreement." Both SRC's president and plaintiff's bankers testified that all parties understood that this contingency meant, among other things, that the loan would not be finalized until the 1986 audit report was available.

Plaintiff's bankers also testified at length that the loan approval process they undertook in May concerned the commitment letter only, not approval for the funding of a loan. Thus, before the loan was funded, the approval process had to be repeated in August and

September, based on additional information including assurances from defendant about SRC's 1986 financial position.

On 14 August 1986, Mr. Robert Moore, defendant's audit partner, telephoned Mr. Pike to discuss violations by SRC of its existing loan agreements with plaintiff. Mr. Moore asked Mr. Pike if plaintiff was willing to waive the violations so that the loans would not be in default. Mr. Pike would not agree to waive the violations without assurances that SRC's financial position was sound.

As a result of this conversation, Mr. Pike was provided a draft of defendant's 1986 audit report. All the financial information was included in the draft, including the footnotes to the financial statements and defendant's audit opinion (with defendant's name typed but not signed). The draft was compiled from defendant's audit work and it had been reviewed by defendant; editorial changes to the typed draft were handwritten by one of defendant's auditors. The financial information in the draft was identical to that in the final audit report.

During the 14 August 1986 telephone conversation, Mr. Moore told Mr. Pike that the financial information included on this draft was final, and that only nonsubstantive editorial changes would be made. A written notation in defendant's work papers confirmed that a conversation between Mr. Moore and Mr. Pike took place. Mr. Moore and Mr. Pike did not specifically discuss the Jo-Ann's loan during their conversation.

Although the chief financial officer of SRC testified that he had no recollection of speaking with defendant about how the Jo-Ann's acquisition would be funded, evidence was presented to show that defendant had notice of the Jo-Ann's acquisition: (1) defendant specifically identified acquisition financing as a special audit risk for purposes of defendant's conduct of SRC's 1986 audit; (2) in July 1986, defendant was in possession of a publication by a stockbroker, Davenport & Co., which announced, "[t]he new upside potential [of the Jo-Ann's transaction] is not without peril as we expect [SRC] will use borrowed money for the acquisition thus significantly raising debt levels." This publication was initialed by employees of defendant, and filed in defendant's workpapers; and (3) in August 1986, before the audit was finalized, defendant received information from SRC that SRC "has entered into an agreement to acquire the confectionery division of [Jo-Ann's]. This transaction will be financed out of proceeds from operations as well as bank borrowings." This information was found in SRC's 1986 Form 10-K which was circulated to

NCNB NATIONAL BANK v. DELOITTE & TOUCHE

[119 N.C. App. 106 (1995)]

defendant as early as 20 August 1986 and which was reviewed by defendant in connection with its audit work.

The Jo-Ann's loan was funded by plaintiff 15 September 1986. Defendant's final audit opinion was issued 14 October 1986. In late 1986, SRC began to experience internal strife which led to the financial demise of the company. Defendant withdrew as SRC's auditors in July 1987; on 31 July 1987, defendant also withdrew its opinion on SRC's 1986 financial statements.

In September 1987, SRC retained Coopers & Lybrand (Coopers) to audit its 1987 statements. In order to determine reliable ending 1986 numbers, Coopers reviewed defendant's 1986 work, including defendant's internal papers. Coopers determined that "[t]he conclusions that resulted from [defendant's] audit work were incorrect." As a result, SRC restated its 1986 financial statements.

SRC had reported profits exceeding $842,000.00 in its 1986 financial statements audited by defendant; its restated 1986 financial statements reported profits of about $133,000.00. For fiscal year 1987, SRC's financial statements (audited by Coopers) reported that SRC lost more than $7 million. In April 1988, SRC filed for bankruptcy.

### ARGUMENTS

Defendant first argues on appeal that the trial court committed reversible error in denying defendant's motions for a directed verdict and judgment notwithstanding the verdict on the grounds that there was insufficient evidence to support the jury verdict on the issue of negligent misrepresentation.

"To survive a motion for a directed verdict, the non-moving party . . . must present 'sufficient evidence to sustain a jury verdict in [its] favor, . . . or to present a question for the jury.' " *Best v. Duke University*, 337 N.C. 742, 749, 448 S.E.2d 506, 510 (1994) (*quoting Davis v. Lilly Co.*, 330 N.C. 314, 323, 411 S.E.2d 133, 138 (1991)). A motion for judgment notwithstanding the verdict uses this same standard because this motion is essentially "a renewal of the movant's prerequisite motion for a directed verdict." *Abels v. Renfro Corp.*, 335 N.C. 209, 214, 436 S.E.2d 822, 825 (1993).

Our Supreme Court addressed negligent misrepresentation as to accountants in *Raritan River Steel Co. v. Cherry, Bekaert and Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988) (*Raritan I*), stating:

[t]he tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care. We conclude that a party cannot show justifiable reliance on information contained in audited financial statements without showing that he relied upon the actual financial statements themselves to obtain this information. (Citations omitted.)

*Id.* at 206, 367 S.E.2d at 612. Regarding this reliance, the Court adopted the standard set forth in the *Restatement (Second) of Torts* § 552 (1977), which states:

*Information Negligently Supplied for the Guidance of Others.*

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . [T]he liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Our Court noted that "liability should extend not only to those with whom the accountant is in privity or near privity, but also to those persons, or classes of persons, whom he knows and intends will rely on his opinion, or whom he knows his client intends will so rely." *Id.* at 214, 367 S.E.2d at 617. The Court commented that courts have not been uniform in their approach to application of the Restatement approach, but went on to state that

[t]he Restatement's text does not demand that the accountant be informed by the client himself of the audit report's intended use. The text requires only that the auditor *know* that his client intends to supply information to another person or limited group of persons. Whether the auditor acquires this information from

his client or elsewhere should make no difference. If he knows at the time he prepares his report that specific persons, or a limited group of persons, will rely on his work, and intends or knows that his client intends such reliance, his duty of care should extend to them.

*Id.* at 215, 367 S.E.2d at 618.

Defendant argues that plaintiff failed to prove that it actually relied upon the audit opinion and financial statements in the instant case. Further, defendant argues that plaintiff did not prove that defendant knew that plaintiff would rely on its audit opinion in a particular transaction.

[1] We disagree. We believe that there was sufficient evidence presented to show that the tort of negligent misrepresentation occurred in the instant case, and that plaintiff relied upon financial statements prepared by defendant to its detriment. We also believe there was sufficient evidence that, although defendant was not specifically informed by SRC itself of the audit report's intended use, defendant *knew* that SRC intended to supply information to plaintiff, their primary bank. Again, as the Restatement makes clear, whether defendant acquired this information from SRC or elsewhere makes no difference. If defendant knew at the time it prepared its report that plaintiff would rely on its work, and knew that SRC intended such reliance, defendant's duty of care extended to plaintiff.

The evidence supporting our reasoning includes extensive testimony from plaintiff's bankers explaining the loan approval process from the commitment letter to the subsequent final loan; the testimony from plaintiff as well as SRC that it was understood that financing the loan was contingent on defendant's 1986 audit; defendant's specific identification of acquisition financing as a special audit risk for purposes of defendant's conduct of SRC's 1986 audit; the publication by Davenport & Co., initialed by employees of defendant and filed in defendant's workpapers, announcing the Jo-Ann's transaction and referring to borrowed money; and SRC's 1986 Form 10-K which was circulated to defendant and reviewed by defendant in connection with its audit work, stating that SRC "has entered into an agreement to acquire the confectionery division of [Jo-Ann's]. This transaction will be financed out of proceeds from operations as well as bank borrowings."

As such, we find that the trial court properly denied defendant's motions for a directed verdict and judgment notwithstanding the verdict on the grounds that there was insufficient evidence to support the jury verdict on the issue of negligent misrepresentation.

[2] Defendant next argues that the trial court committed reversible error in denying defendant's motions for a directed verdict and a judgment notwithstanding the verdict on the grounds that the claims of plaintiff were barred by the applicable statute of limitations and statute of repose. Defendant specifically argues that pursuant to North Carolina General Statutes § 1-15(c) (1983), which governs malpractice claims against professionals, this claim must have been brought within three years of the "last act" giving rise to the claim of negligence. Defendant asserts that because the date of the conversation between Mr. Pike and Mr. Moore and the date that the audit opinion was delivered to SRC were both more than three years before the instant action was filed, this action was barred.

Plaintiff argues that the applicable statute of limitations is found in North Carolina General Statutes § 1-52(5) (Cum. Supp. 1994), "[f]or any . . . injury to the person or rights of another, not arising on contract and not hereafter enumerated." Plaintiff claims that the reliance tort of negligent misrepresentation "does not accrue until two events occur: first, the claimant suffers harm because of the misrepresentation and second, the claimant discovers the misrepresentation." *Jefferson-Pilot Ins. Co. v. Spencer*, 336 N.C. 49, 57, 442 S.E.2d 316, 320 (1994). Plaintiff argues that both of these events occurred within three years of plaintiff's filing of the suit on 14 September 1989: plaintiff was injured on 15 September 1986, when it disbursed loan funds to SRC in reliance on defendant's representations, and plaintiff only discovered defendant's misrepresentations in 1987, when defendant withdrew its 1986 audit. Plaintiff states that defendant "argues erroneously that the statute of limitations for malpractice actions, N.C. Gen. Stat. § 1-15(c), governs accrual of [plaintiff's] negligence claims. This is not a malpractice action."

We agree with plaintiff. The instant case is not a malpractice case with privity between plaintiff and defendant; it is a negligent misrepresentation case. (*See Insurance Co. v. Holt*, 36 N.C. App. 284, 288, 244 S.E.2d 177, 180 (1978), where our Court held "that claims for relief for attorney malpractice are actions sounding in contract and may properly be brought only by those who are in privity of contract with such attorneys by virtue of a contract providing for their employ-

ment." *See also Jefferson-Pilot Ins. Co. v. Spencer*, 336 N.C. at 56, 442 S.E.2d at 319, where our Supreme Court stated that because the claim was one for negligent misrepresentation, "it [was] governed by the statute of limitations set out in N.C.G.S. § 1-52(5)[.]")

Therefore, we find the trial court properly denied defendant's motions for a directed verdict and a judgment notwithstanding the verdict on the grounds that the claims of plaintiff were barred by the applicable statute of limitations and statute of repose.

Finally, defendant argues that the trial court committed reversible error by failing to present defendant's jury instruction to the jury on the contributory negligence of plaintiff. We have reviewed the record and the evidence in this case and we find that the trial court properly declined to present a separate jury instruction relating to contributory negligence.

PLAINTIFF'S CROSS-APPEAL

Because of our disposition of defendant's arguments, we need not reach plaintiff's cross-appeal.

* * *

No error.

Judges COZORT and McGEE concur.