**Bobby S. SIMPSON, on his own behalf and on behalf of a class of other persons similarly situated, Plaintiff,**

v.

**SPECIALTY RETAIL CONCEPTS, INC., Alan R. Kleinmaier, David N. Kleinmaier, C. Banks Finger, and Deloitte, Haskins & Sells, Defendants.**

**No. 6:88CV00100.**

United States District Court, M.D. North Carolina, Winston–Salem Division.

Dec. 1, 1995.

Marion G. Follin, III, Greensboro, NC, Martha A. Geer, Raleigh, NC, for plaintiff.

Norman L. Sloan, George S. Thomas, Stephen M. Russell, Winston–Salem, NC, James T. Williams, Jr., Greensboro, NC, John P. Van Zandt, III, Winston–Salem, NC, Jonathan A. Berkelhammer, Greensboro, NC, for defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

On February 8, 1988, Plaintiff Bobby S. Simpson instituted this class action suit alleging various federal and state law violations related to the sale of securities. Defendant Deloitte, Haskins & Sells ("DH & S") and Plaintiff Simpson both filed Motions for Partial Summary Judgment within approximately a month of the trial's scheduled commencement date of November 27, 1995.[1] On November 20, 1995, the parties were given telephonic notice that Defendant DH & S's Motion was DENIED and Plaintiff Simpson's Motion was GRANTED IN PART and DENIED IN PART. This Memorandum Opinion sets forth the reasons for those rulings.

### I.

■ Summary judgment is proper only if there is no genuine issue as to any material fact. The moving party on a motion for summary judgment has the burden of pointing to deficiencies in the record as to matters upon which the opposing party has the burden of proof such that the opposing party cannot prove its claim or defense or of showing otherwise why, upon the undisputed facts in the record, the moving party is entitled to judgment as a matter of law. The party opposing the motion for summary judgment may not merely rest on its pleadings, but must provide evidence or point to evidence already in the record, properly authenticated pursuant to Rule 56(e), that would be sufficient to support a jury verdict in its favor. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Orsi v. Kirkwood*, 999 F.2d 86 (4th Cir.1993); *Herold v. Hajoca Corp.*, 864 F.2d 317 (4th Cir. 1988), *cert. denied*, 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989).

### II.

This case began nearly eight years ago when Plaintiff Simpson filed a class action suit against Specialty Retail Concepts, Inc. ("SRC"), a national franchisor and owner of specialty food retail shops, various SRC directors and officers and DH & S, the independent public accounting firm which had served as auditors for SRC and its corporate predecessors from 1981 to July 31, 1987.[2] The suit seeks to recover damages allegedly suffered by SRC's investors due to the fact that SRC's fiscal year 1986 financial statements ("1986 financial statements"), which SRC included in their 1986 10–K filing with the Securities and Exchange Commission and their 1986 Annual Report, overstated the corporation's net income. The claims against DH & S are predicated upon DH & S's certification of SRC's inaccurate 1986 financial statements in the Report of Independent Public Accountants ("RIPA" or "audit opinion"). DH & S contractually authorized SRC to include DH & S's audit opinion certifying SRC's 1986 financial statements in SRC's 10–K and Annual Report.[3]

---

1. Simpson was allowed to file his Motion outside normal time limits because it was contingent upon the outcome of another case which was only recently conclusively resolved. DH & S received permission to file a Supplementary Motion for Summary Judgment regarding claims first raised in the Third Amended Complaint on October 21, 1993. Although DH & S waited more than two years before filing its Motion and then raised issues beyond the scope of its authorization, the Motion was allowed because its consideration did not delay these proceedings, but rather expedited them. *See generally* Local Rule 206(g), M.D.N.C.

2. SRC was voluntarily dismissed from this litigation on August 3, 1993, after it received a discharge for all debts arising before December 21, 1990, in United States Bankruptcy Court for the Western District of North Carolina. While three of the individual Defendants, Alan R. Kleinmaier, David N. Kleinmaier and C. Banks Finger, have never been formally dismissed from this case, Plaintiff Simpson has not pursued his claims against Alan R. Kleinmaier and Finger since they each filed for personal bankruptcy in federal court. Simpson did obtain an order from the United States Bankruptcy Court for the Middle District of North Carolina authorizing him to continue the suit against David N. Kleinmaier, but only to recover from the proceeds of a directors' and officers' liability insurance policy.

3. DH & S made the following specific representations in its RIPA:

 We have examined the consolidated balance sheets of [SRC] as of May 31, 1986 and 1985 and September 30, 1984 and the related statements of consolidated income and retained earnings and of changes in consolidated financial position for the years ended May 31, 1986

In its current Motion, DH & S argues that it is entitled to summary judgment on three of Simpson's claims.[4] Arguments regarding the sufficiency of the federal securities claim in Count Two and the state-law claims at issue in Counts Twelve and Thirteen will be considered separately below.

## A.

■ Count Two alleges that DH & S violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("§ 10(b)"), and its implementing corollary, Rule 10b–5, 17 C.F.R. § 240.10b–5, when it first issued the RIPA. DH & S argues that the statute of limitations, which in this case is two years,[5] bars this claim. In this context, the statute of limitations begins to run when the plaintiff acquires inquiry notice of the fraud. *See Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993). If, as DH & S contends, Simpson had inquiry notice in early August 1987, when media reports emerged regarding DH & S's withdrawal of its audit opinion certifying SRC's 1986 financial statements, Count Two, which was first offered for amendment on May 28, 1991, is beyond the limitations period. However, even if Simpson had inquiry notice at the date suggested by DH & S, the statute of limitations defense fails because Count Two relates back to the original complaint filed on February 8, 1988, a date well within the two-year period starting in August 1987.

"An amendment of a pleading relates back to the date of the original pleading when ...

the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R.Civ.P. 15(c). Simpson's original complaint contained a count analogous to Count Two. This claim was withdrawn and the claim which is now included within Count Three regarding DH & S's conduct in the spring of 1987 was substituted. Count Two, which reinstated the federal claim against DH & S for knowing or reckless misconduct in the initial certification, was added later, over DH & S's objection.[6] However, throughout this period, each version of Simpson's Complaint contained state-law negligence claims against DH & S regarding the same "conduct, transaction, or occurrence" underlying Count Two, the initial certification. *See Simpson v. Specialty Retail Concepts, Inc.*, No. 6:88CV00100, at 8 (M.D.N.C. Jan. 27, 1992) ("DHS knew that Simpson was alleging violations by DHS based on its [certification of the] 1986 financial statements when the litigation began. Simpson has retained negligence claims against the Defendant based on the 1986 statements. Therefore, DHS's actions relating to the 1986 financial statements always have been part of this litigation."). "The fact that an amendment changes the legal theory on which the action initially was brought is of no consequence if the factual situation upon which the action depends remains the same and has been brought to defendant's attention by the original pleading." 6A C. Wright, A. Miller & M. Kane,

---

**4.** Some additional issues raised in DH & S's Motion were mooted by the Memorandum Order dated November 1, 1995.

and September 30, 1984 and for the eight months ended May 31, 1985. Our examinations were made in accordance with generally accepted auditing standards and, accordingly, included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances.

In our opinion such consolidated financial statements present fairly the financial position of [SRC] as of May 31, 1986 and 1985 and September 30, 1984 and the results of their operations and the changes in their financial position for the periods then ended, in conformity with generally accepted accounting principles applied on a consistent basis.

**5.** The statute applicable to this case provides that the forum state's limitations period for equivalent causes of action establishes the limitations period for the federal securities claim. 15 U.S.C. § 78aa–1. The relevant state statute is N.C.Gen. Stat. § 78A–56(f) which establishes a two-year limitations period. *See Andrews v. Fitzgerald*, 823 F.Supp. 356, 365 (M.D.N.C.1993).

**6.** DH & S's objections at that time were couched as complaints regarding delay and prejudice. It should be noted that DH & S made a strategic choice not to pursue this statute of limitations argument at that time although it could have objected to the proposed third amendment on the basis of futility. *See* Def. DH & S's Mem. of Law in Opp. to Pl.'s Mot. to Amend Compl. at 12 n. 6. DH & S's statute of limitations defense could thus be treated as waived.

*Federal Practice and Procedure* § 1497 at 94–95. As a result, DH & S had sufficient notice of the claim in Count Two to warrant relation back treatment for that cause of action; thus, the statute of limitations does not bar Count Two.

■ Defendant DH & S also contends that summary judgment is proper on Count Two because Plaintiff Simpson has produced insufficient evidence that DH & S's alleged misstatements were made with scienter, one of the elements of a § 10(b) claim. *See Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir.1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992). In this context, scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). While neither the United States Supreme Court, nor the Fourth Circuit has reached the question, numerous circuit courts and at least two district courts from the Fourth Circuit have expressly held that severe recklessness satisfies § 10(b)'s *mens rea* requirement. *See, e.g., Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir.1992) (defining minimum scienter as "highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it"); *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990), *cert. dismissed*, 502 U.S. 976, 112 S.Ct. 576, 116 L.Ed.2d 601 (1991) (same); *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir.1989) (same); *In re Cryomedical Sciences, Inc. Securities Litigation*, 884 F.Supp. 1001, 1013 (D.Md.1995) (same); *Breckley v. Amway Corp.*, Fed.Sec.L.Rep. 94,736, 1989 WL 140397 (D.S.C. Aug. 24, 1989) ("While recklessness will support a 10b–5 claim, it must constitute a 'lesser form of intent [to deceive] than merely a greater degree of ordinary negligence.' "). *See also Malone v. Microdyne Corp.*, 26 F.3d 471, 479

n. 9 (4th Cir.1994) (noting that "[m]ost circuits have held that recklessness also may satisfy the scienter requirement"); *Burlington Industries, Inc. v. Edelman*, 666 F.Supp. 799, 816 (M.D.N.C.1987) (assuming that a showing of recklessness would suffice). In light of this authority, it is held that Simpson need only raise a genuine issue of material fact as to DH & S's severe recklessness to avoid summary judgment on Count Two.

■ In essence, DH & S asserts that because Simpson has failed to present sufficient expert testimony on the issue of scienter, while DH & S has offered significant expert opinion that it acted properly, summary judgment should be granted. It should first be noted that circumstantial evidence can support an inference of scienter under § 10(b), *see Malone*, 26 F.3d at 479 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692 n. 30, 74 L.Ed.2d 548 (1983)); thus, Simpson is not necessarily required to produce expert testimony to prevail on Count Two. In any event, Simpson has introduced expert testimony not simply critical of DH & S's conduct of the 1986 audit, but actually contending that, contrary to DH & S's representations in its RIPA, SRC's 1986 financial statements included revenue recognized in violation of generally accepted accounting principles ("GAAP"). *See* Pl.'s Resp. to Def. DH & S's Mot. for Sum. Judg't as to Pl.'s Third Amended Compl. at 6. While, as DH & S notes, Simpson's expert witness is not an expert on federal securities fraud, his testimony regarding violations of GAAP, a subject on which he appears qualified to discourse, could serve as evidence from which the fact finder could draw inferences regarding scienter.[7]

Simpson has also pointed to record evidence contained in documents and testimony from DH & S and from the Coopers & Lybrand ("C & L") auditors who replaced them. The portion of this material which relates to DH & S's treatment of collectibility issues is particularly relevant because of the

---

7. DH & S appears to suggest that Simpson must present expert testimony stating ultimate conclusions regarding securities law violations. Such evidence is not only unnecessary, but would likely be improper. *See Molecular Technology Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir.1991).

effect collectibility has on revenue recognition and bad debt allowance calculations pursuant to GAAP. *See* Pl.'s Resp. to Def. DH & S's Mot. for Sum. Judg't as to Pl.'s Third Amended Compl. at 4–6. Simpson essentially argues that this evidence shows that DH & S relied too heavily on SRC's representations, conducted inadequate testing and document review to justify certain conclusions and reached conclusions which were unsupported by the available information, and thereby knowingly or recklessly made misrepresentations in the RIPA about compliance with GAAP and generally accepted auditing standards ("GAAS").

DH & S portrays all of these arguments as attempts by Simpson to impose securities fraud liability based on negligence, a proposition which the United States Supreme Court has expressly rejected. *See Ernst*, 425 U.S. at 193 n. 12, 96 S.Ct. at 1381 n. 12. They not only deny that GAAP and GAAS were violated, but also insist that evidence of such violations is insufficient to establish securities fraud. While this latter statement, strictly construed, may be true, the Fourth Circuit has recently observed that "[t]he Financial Accounting Standards of GAAP and the anti-fraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated." *Malone*, 26 F.3d at 478. In addition, where, as here, the alleged misrepresentations underlying the securities fraud claim relate to compliance with GAAP and GAAS, evidence of such violations is particularly probative. Finally, Simpson's evidence goes not only to the question of whether GAAP and GAAS were violated, but also whether DH & S knew or recklessly disregarded the fact that these standards were violated at the time it made representations in its RIPA concerning GAAP and GAAS compliance.

It is true that the evidence presented by Simpson on the question of whether DH & S acted knowingly or recklessly is hardly overwhelming. However, in light of well-established authority recognizing the jury's preeminent role in assessing the presence or absence of scienter, *see Malone*, 26 F.3d at 479; *Securities and Exchange Commission v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1072 (M.D.N.C.1980), and the fact that all reasonable, favorable inferences must be credited to the plaintiff at this stage, Simpson's showing cannot be declared insufficient as a matter of law. *See Fine*, 919 F.2d at 297 (ruling that evidence of GAAP and GAAS violations related to revenue recognition and bad debt reserve raised genuine issues of material fact regarding scienter).

DH & S's Motion for Summary Judgment on Count Two is DENIED.

### B.

█ Plaintiff Simpson has filed two state, common law tort claims against Defendant DH & S for its role in certifying SRC's 1986 financial statements. While Count Twelve is styled as a claim for negligent misrepresentation and Count Thirteen is labeled as a negligent accounting and auditing claim, both counts are based on the allegation that in performing the 1986 audit and providing the RIPA, DH & S owed a duty of reasonable care to third-party investors. DH & S seeks summary judgment on both these counts.

In *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609 (1988) ("*Raritan I*"), the North Carolina Supreme Court discussed at length an accountant's duty of care to third-parties.[8] While *Raritan I* dealt specifically with a third-party's negligent misrepresentation claim against an accounting firm, the court construed the suit as more of a general negligence claim, rather than a strict misrepresentation claim. *Id.*, 322 N.C. at 206, 367 S.E.2d at 612 (stating that in this context, "[t]he tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care"). Therefore, it is determined that *Raritan I*'s standard for liability applies to all negligence-based claims brought by third-parties against accountants. As a result, Counts Twelve and Thirteen are

---

8. The parties have assumed that North Carolina law governs Counts Twelve and Thirteen and for the purposes of resolving this Motion, that assumption is adopted.

deemed fully duplicitous and Count Thirteen is DISMISSED.[9]

DH & S argues that, under *Raritan I*, it does not owe Simpson or the class of investors whom he represents a duty of care and that summary judgment on Count Twelve is therefore warranted. In *Raritan I*, the court rejected the polar extremes of a narrow, near-privity-based duty and a broad, foreseeability-based duty, and instead concluded that the intermediate approach articulated in § 552 of the Restatement (Second) of Torts provided the most sensible standard in this context. Section 552 provides as follows:

Information Negligently Supplied for the Guidance of Others.

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through the reliance upon it in a transaction that he intends the information or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Rest. (Second) of Torts* § 552.

DH & S insists that no member of the investor class could be considered a "person or one of a limited group of persons" to whom a duty flows, without converting what was intended to be an intermediate standard into the more liberal, foreseeability test which the *Raritan I* court expressly rejected. DH & S has cited four district courts which have rejected public-market investors' attempts to impose liability on information providers under § 552(2). *See In re Crazy Eddie Securities Lit.*, 812 F.Supp. 338, 360 (E.D.N.Y.1993); *In re Delmarva Securities Lit.*, 794 F.Supp. 1293, 1311 (D.Del.1992) (following *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1258 (D.Del.1991)); *In re Sahlen & Associates Securities Lit.*, 773 F.Supp. 342, 374 (S.D.Fla.1991); *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 749 F.Supp. 1042, 1049 (D.Or.1990). These cases are held to be unpersuasive because they offer no real analysis, but rather simply assert that extending the § 552(2) duty to protect investors necessarily stretches it into a foreseeability standard in all cases.[10]

9. Count Thirteen was predicated upon two North Carolina Court of Appeals' decisions which predate the North Carolina Supreme Court's ruling in *Raritan I*. The first of these two cases, *Snipes v. Jackson*, 69 N.C.App. 64, 316 S.E.2d 657, *disc. rev. denied*, 312 N.C. 85, 321 S.E.2d 899 (1984), recognized that those in privity with accountants could sue for professional negligence. The second case, *United Leasing Corp. v. Miller*, 45 N.C.App. 400, 263 S.E.2d 313, *disc. rev. denied*, 300 N.C. 374, 267 S.E.2d 685 (1980), extended liability for professional negligence to protect third-parties in certain situations. Simpson argues that these two cases establish the standard for determining whether DH & S's duty of care extends to investors under Count Thirteen. Assuming this interpretation was correct prior to the ruling in *Raritan I*, it is determined that those earlier lower court holdings were implicitly modified by the North Carolina Supreme Court's later decision in *Raritan I*.

10. It should also be noted that courts which have attempted to go beyond conclusory statements in dismissing investor claims under § 552(2) appear, by focusing on the rationale articulated in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 189, 174 N.E. 441, 448 (1931), to be in danger of narrowing § 522(2) from an intermediate position back into the restrictive, near-privity standard. *See Chanoff v. U.S. Surgical Corp.*, 857 F.Supp. 1011, 1022 (D.Conn.), *aff'd*, 33 F.3d 50 (2d Cir.) (table), *cert. denied*, ⸻ U.S. ⸻, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994); *In re Westinghouse Securities Lit.*, 832 F.Supp. 948, 987–88 (W.D.Pa.1993). In contrast, the North Carolina Supreme Court has explicitly rejected the *Ultramares* approach. *Raritan I*, 322 N.C. at 211, 367 S.E.2d at 615.

Contrary to what these courts have said, the extension of accountant liability to protect public-market investors is not always tantamount to foreseeability. For example, in this case, a reasonable fact finder could determine that DH & S conducted its audit and prepared the RIPA with *knowledge* that: (1) the RIPA would be included in SRC's 10–K and Annual Report; and (2) SRC intended potential, public-market investors to rely on that information. The same fact finder could also decide that it was *foreseeable* to DH & S, *but not known,* that SRC's potential creditors would also rely on the RIPA. DH & S could therefore be held liable to public-market investors based on its knowledge, without necessarily being subject to the claims of other plaintiffs, such as SRC's creditors, who are only foreseeable. The foregoing analysis establishes that public-market investors can constitute a "class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." *Rest. (Second) of Torts* § 552, Comment h. *See also id.,* Illustrations 4–7 (distinguishing knowledge from foreseeability); *Guenther v. Cooper Life Sciences, Inc.,* 759 F.Supp. 1437, 1443 (N.D.Cal. 1990) (finding accountants potentially liable to investors under § 552(2) because they were "aware not just of 'the ever-present possibility of repetition to anyone,' but of [the corporation]'s intention to distribute the audited report to a clearly defined group—potential investors").

While public-market investors who read and rely on 10–K filings and annual reports likely constitute a large group, whose members were not individually designated in advance, it is an identifiable group "for whose benefit and guidance [DH & S] intends to supply the information or knows that [SRC] intends to supply it...." *Rest. (Second) of Torts* § 552(2)(a). DH & S's attempt to read some further independent meaning into the phrase "limited group" is unwarranted. *See Guenther,* 759 F.Supp. at 1443 ("[The accounting firm]'s contention that potential investors constitute an unlimited class presupposes that the reference to 'limited' in section 552 refers to a group's size. The adjective 'limited,' however, pertains not to size, but to

identifiability ... [I]t is not necessary that a group be restricted by size in order to qualify as 'limited' under section 552."). DH & S's position disregards the key policy the North Carolina Supreme Court articulated when it adopted § 552's intermediate position, namely that accountants providing information in a business context should be liable for the risks they knowingly assume. *See Raritan I,* 322 N.C. at 213, 367 S.E.2d at 616 ("[Auditors'] liability should be commensurate with those persons or classes of persons whom they know will rely on their work. With such knowledge the auditor can, through purchase of liability insurance, setting fees, and adopting other protective measures appropriate to the risk, prepare accordingly."). *See also Guenther,* 759 F.Supp. at 1443 ("It is enough that providers of information know that their client intends to provide the information for the benefit and guidance of a group of people, and that the information provider understand the parameters that define the third-party group."). DH & S's restrictive interpretation of § 552(2) would completely frustrate this stated judicial policy by making DH & S's knowledge of SRC's intent to use the RIPA to influence public-market investors irrelevant.

DH & S has offered no reason why North Carolina courts would likely deviate from their general rule basing the scope of an information provider's duty on its knowledge of the intended reach of its representations and carve out a special liability exemption in cases where public-market investors are the intended recipients of information. In fact, several considerations suggest that such an exception would be inappropriate. First, DH & S has offered no evidence that, in cases involving representations to the investing public, the *Raritan I* court's assumption that information providers can insure against risks associated with their intentional provision of information is faulty. Second, statements in *Raritan I* indicate that North Carolina courts would likely view liability as particularly appropriate when public-market investors are the intended targets of negligently, misleading information. *Raritan I,* 322 N.C. at 211, 367 S.E.2d at 615 (stating that "[a]ccountants' audit opinions are in-

creasingly relied upon by the investing and lending public in making financial decisions" and rejecting a restrictive liability rule "[b]ecause of this heavy public reliance on audited financial information"). Finally, a blanket ban on public-market investor claims under § 552(2) would create an unacceptably inequitable system under which information providers who intentionally influence large numbers of people, negligently mislead them and thereby cause a large amount of damage do not have to compensate their victims, while others who dispense information to only a small number of people and whose negligence therefore only produces a small measure of harm are held liable. *Cf. Guenther,* 759 F.Supp. at 1443 ("Where a group is identifiable, accountants and other information providers are not relieved of liability merely because the group of people whom they intend to influence with their information is too large."). For all of these reasons, it is determined that Simpson has raised a material question of fact regarding whether DH & S owed the public-market investor class a duty of care under § 552(2).

DH & S also seeks summary judgment on Count Twelve as to the Plaintiff Class because there is no record evidence of actual reliance by the members of the class. In essence, DH & S seeks to have the class decertified as to Count Twelve because the fraud-on-the-market presumption does not apply to that claim. DH & S's arguments on this subject have been heard and rejected previously. Common questions related to Count Twelve should be resolved at trial and the individual issues should then be determined through a mechanism approved by the Court after consulting the parties.

DH & S's Motion for Summary Judgment on Count Twelve is DENIED.

### III.

Plaintiff Simpson seeks partial summary judgment on Counts Two, Six and Twelve.[11] He asserts that issues underlying each of these claims were resolved against Defendant DH & S in another case. As a result, Simpson argues that the doctrine of collateral estoppel warrants partial summary judgment in his favor.

■ "Collateral estoppel precludes relitigation of an issue decided previously in judicial or administrative proceedings provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in an earlier proceeding." *In re McNallen,* 62 F.3d 619, 624 (4th Cir.1995). In this case, the preceding judgment is *NCNB, National Bank of North Carolina v. Deloitte & Touche,* No. 89CVS11919 (Mecklenburg Cty.Super.Ct. May 11, 1993), *aff'd,* 119 N.C.App. 106, 458 S.E.2d 4 (1995), *cert. denied,* 462 S.E.2d 514, 341 N.C. 651 (1995). Simpson was not a party to *NCNB,* but he seeks to use the *NCNB* judgment against DH & S, who was a party in *NCNB.*[12] This variation of the doctrine is known as non-mutual, offensive collateral estoppel. *See Parklane Hosiery Company v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). Because the prior decision in this case arose in North Carolina state court, the Full Faith and Credit Act, 28 U.S.C. § 1738, mandates that North Carolina's law regarding collateral estoppel be used to resolve Simpson's Motion. *See Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980) (stating that "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so"); *McNallen,* 62 F.3d at 624 ("In determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel.").

■ North Carolina law sets out four conditions necessary to trigger traditional, mutual collateral estoppel:

(1) The issues to be concluded must be the same as those involved in the prior action; (2) in the prior action, the issues must have been raised and actually litigated; (3) the issues must have been material and relevant to the disposition of the prior action;

---

**11.** Count Thirteen's dismissal moots Simpson's Motion as to that claim.

**12.** DH & S is now known as Deloitte & Touche.

and (4) the determination made of these issues in the prior action must have been necessary and essential to the resulting judgment.

*King v. Grindstaff,* 284 N.C. 348, 358, 200 S.E.2d 799, 806 (1973). In addition, at least one published North Carolina decision has embraced, as a general principle, the modern trend authorizing the non-mutual, offensive use of collateral estoppel. *See Tar Landing Villas Owners' Ass'n v. Town of Atlantic Beach,* 64 N.C.App. 239, 243, 307 S.E.2d 181, 184–85 (1983), *disc. rev. denied,* 310 N.C. 156, 311 S.E.2d 296 (1984) ("While we recognize these exceptions [regarding mutuality and offensive application] and approve of the expanded doctrine as a way to end vexatious litigation, we, nevertheless, find that it would be inequitable to allow petitioners, even those with privity, to assert the doctrine in this case."). *See also Cook v. Bankers Life and Casualty Co.,* 329 N.C. 488, 492, 406 S.E.2d 848, 850 (1991) (interpreting *McInnis v. Hall,* 318 N.C. 421, 349 S.E.2d 552 (1986), as relaxing the mutuality requirement generally, not only for defensive assertions of collateral estoppel).

█ In *Tar Landing,* the North Carolina Court of Appeals approved of the United States Supreme Court's decision "'to grant trial courts broad discretion [under federal law] to determine when [non-mutual, offensive collateral estoppel] should be applied.'" *Tar Landing,* 64 N.C.App. at 244, 307 S.E.2d at 185 (quoting *Parklane,* 439 U.S. at 331, 99 S.Ct. at 651–52). Under *Parklane,* courts may apply non-mutual, offensive collateral estoppel unless: (1) the party seeking to use the doctrine "could have easily joined in the earlier action"; or (2) "the application of offensive estoppel would be unfair to a defendant." *Parklane,* 439 U.S. at 330–31, 99 S.Ct. at 651. The *Tar Landing* court added an additional gloss on the *Parklane* analysis by cautioning North Carolina courts to "strictly scrutinize whether to apply the doctrine in light of judicial economy and fairness to the other party." *Tar Landing,* 64 N.C.App. at 244, 307 S.E.2d at 185.

The subsections which follow examine the factual and legal determinations underlying *NCNB* and compare them to the issues involved in this case so it can be decided whether North Carolina's requirements for collateral estoppel generally and the non-mutual, offensive strand of the doctrine in particular are satisfied in this instance.

### A.

The following discussion sets out the facts adjudged in *NCNB* as reported by the North Carolina Court of Appeals. *See NCNB,* 119 N.C.App. at 108–111, 458 S.E.2d at 5–7. NCNB was SRC's primary bank beginning in 1985. During 1985 and 1986, NCNB made various business loans to SRC. The loan agreements between NCNB and SRC required review of SRC's audited financial statements and this review was a substantial part of the loan approval process. By 1988, SRC had defaulted on a number of its loans from NCNB. NCNB filed suit against DH & S in Mecklenburg Superior Court on September 14, 1989, asserting among other things that DH & S was liable to NCNB for negligent misrepresentation based on its issuance of an audit opinion certifying SRC's 1986 financial statements. On February 19, 1993, following a trial, a jury returned a verdict in favor of NCNB on its negligent misrepresentation claim as to one of the eight loans for which NCNB had sued. A judgment against DH & S in the amount of $385,809.72 was entered on May 11, 1993. On June 6, 1995, the North Carolina Court of Appeals affirmed the trial court judgment; the North Carolina Supreme Court then declined further review on October 5, 1995.

The *NCNB* jury found DH & S liable on a $3.5 million loan from 1986 ("the $3.5 million loan").[13] SRC first approached NCNB about the $3.5 million loan just before the May 31, 1986 end of SRC's fiscal year. To that point, NCNB had received only interim, unaudited financial information from SRC. The parties agreed on a commitment letter for the $3.5 million loan which stated: "Funding of the [$3.5 million] loan is subject to our negotia-

---

**13.** The outstanding balance on the loan was $2,921,123.02. The jury awarded that amount as damages, but found that NCNB could have

mitigated damages in the amount of $2,535,-324.30. Thus, NCNB only received judgment for $385,809.72.

tion of a satisfactory Loan Agreement covering all borrowings. We expect such a Loan Agreement to closely follow covenants already in the existing Loan Agreement." Both SRC's president and NCNB's bankers testified that they understood that this contingency meant that the $3.5 million loan would not be made until NCNB reviewed DH & S's 1986 audit work.

In August and September, 1986, NCNB sought additional assurances from DH & S about SRC's financial condition. Prior to making the $3.5 million loan, NCNB received a draft of SRC's 1986 financial statements as audited by DH & S. All of SRC's 1986 fiscal year financial information was incorporated into the draft, including the footnotes to the financial statements and DH & S's audit opinion. The draft was compiled from DH & S's audit work and it had been reviewed by DH & S. Editorial changes to the typed draft were handwritten in by one of DH & S's auditors. During an August 14, 1986 telephone conversation, Robert Moore, an audit partner with DH & S, told an NCNB banker that the information included in the draft was final, and that only minor editorial changes would be made. NCNB then funded the $3.5 million loan. The substantive material in the draft, including DH & S's certification, was identical to that in the final version used in SRC's 10–K and Annual Report.

In late July 1987, DH & S resigned as SRC's auditors and thereafter withdrew its audit opinion certifying SRC's 1986 financial statements. In September 1987, SRC retained C & L to audit its 1987 fiscal year financial statements. In order to determine reliable ending 1986 numbers, C & L reviewed DH & S's 1986 audit work, including its internal papers. C & L determined that "[t]he conclusions that resulted from [DH & S's] audit work were incorrect." As a result, SRC revised its 1986 financial statements. While SRC's 1986 financial statements certified by DH & S had shown profits exceeding $842,000.00, SRC's restated 1986 financial statements reported profits of only about $133,000.00.

**B.**

Under North Carolina law, " 'negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care.' " *NCNB*, 119 N.C.App. at 112, 458 S.E.2d at 8 (quoting *Raritan I*, 322 N.C. at 206, 367 S.E.2d at 612). The *NCNB* jury heard the facts outlined above, was instructed consistently with the foregoing legal standard, *see* Pl.'s Mot. for Part. Sum. Judg't, Exhibit 5 (transcript of jury instructions at 3269–70), and determined that DH & S committed negligent misrepresentation as to the $3.5 million loan. The North Carolina Court of Appeals affirmed the judgment against DH & S and stated that "there was sufficient evidence presented to show that the tort of negligent misrepresentation occurred in the instant case...." *NCNB*, 119 N.C.App. at 113, 458 S.E.2d at 8.

To reach its verdict, the *NCNB* jury had to determine, among other things, that DH & S's audit opinion certifying SRC's 1986 financial statements was prepared without reasonable care according to the standards of the accounting and auditing profession. *See* Pl.'s Mot. for Part. Sum. Judg't, Exh. 5 (transcript of *NCNB* jury instructions at 3269–70). *See also* Pl.'s Mot. for Part. Sum. Judg't, Exh. 4 (Def.'s Statement of Issues [involved in *NCNB* ] at 2). While there was testimony at trial about a variety of events, as the North Carolina Court of Appeals' opinion makes clear, the jury's determination of liability as to the $3.5 million loan was necessarily based on the audited 1986 financial statements DH & S negligently certified. *See NCNB*, 119 N.C.App. at 113, 458 S.E.2d at 8–9. *See also King*, 284 N.C. at 360, 200 S.E.2d at 807–08 (" 'In discovering what issues were determined by the judgment in a prior action, the court in the second action is free to go beyond the judgment roll, and may examine the pleadings and the evidence in the prior action ... [and] may infer that in the prior action a determination appropriate to the judgment rendered was made as to each issue that was so raised and the determination of which was necessary to support the judgment.' " (quot-

ing 1 B *Moore's Federal Practice*, 2d Ed., § 0.443(4))).[14]

### C.

*NCNB* thus represents a judicial determination that DH & S's audit opinion certifying SRC's 1986 financial statements was prepared and communicated without the reasonable care required by the accounting and auditing profession. As the foregoing discussion illustrates, not only was this matter raised and actually litigated in *NCNB*, but it was a material and relevant issue in that case, the resolution of which was necessary and essential to the judgment rendered. Therefore, three of the four general requirements for collateral estoppel under North Carolina law are satisfied on this issue. The only remaining question under *King* is whether the *same* issue decided in *NCNB* is at stake in this case.

 Plaintiff Simpson's claim against DH & S for negligent misrepresentation raises the same issue of reasonable care as to DH & S's certification of SRC's 1986 financial statements as did *NCNB*. *See supra* Subsection II.B. (discussing elements of Count Twelve). DH & S correctly notes that in *NCNB* the audit opinion was attached to a

draft of SRC's audited 1986 financial statements and that this case involves the final version of SRC's audited 1986 financial statements. However, DH & S does not dispute that, as the North Carolina Court of Appeals reported, the "information in the draft was identical to that in the final audit report." *NCNB*, 119 N.C.App. at 110, 458 S.E.2d at 7. As a result, this purported distinction between the two cases does not negate the identity of the issues of reasonable care which Count Twelve of this case and *NCNB* share.[15]

 Whether the issue of reasonable care decided in *NCNB* is identical to issues involved in Simpson's federal securities claims in Counts Two and Six[16] presents more difficult questions. Simpson seeks to apply preclusively *NCNB*'s determination that DH & S failed to exercise reasonable care in providing its RIPA certifying SRC's 1986 financial statements on the issue of scienter raised by Count Two. He posits that DH & S will argue at trial that it did nothing wrong in conducting the 1986 audit and that the finding of professional negligence made in *NCNB* should bar such a defense. This argument ignores the fact that DH & S's negligence is not at issue

**14.** DH & S argues that the *NCNB* jury may have imposed liability based on the August 14, 1986 phone conversation between Moore and NCNB, rather than on the audit opinion. NCNB never alleged and the court never instructed the jury that DH & S could be held liable based on the negligent conveyance of information in that phone conversation. *See* Pl.'s Mot. for Part. Sum. Judg't, Exh. 1 (*NCNB* Compl. at ¶¶ 24–31), Exh. 5 (transcript of *NCNB* jury instructions at 3269–70). In fact, the only relevant information Moore provided at that time, namely that the draft of the 1986 financial statements would not be substantively changed before it was finally issued, was accurate. While that phone conversation likely informed the jury's determination regarding NCNB's reliance on DH & S's negligently prepared audit opinion, it is the negligent certification of SRC's 1986 financial statements upon which liability had to be based. Therefore, because the interpretation of the *NCNB* judgment advocated by DH & S is not "appropriate to the judgment rendered," *King*, 284 N.C. at 360, 200 S.E.2d at 807, it is rejected.

**15.** Simpson also seeks collateral estoppel for Count Twelve on the question of whether DH & S supplied "materially false information for the

guidance of plaintiff and the members of the class." Pl.'s Mot. for Part. Sum. Judg't at 1. First, while the *NCNB* jury likely found that the information supplied by DH & S was materially false, under *Raritan I*, it is clear that material falsity is not necessarily required for liability to be imposed on accountants in this context. *See supra* Subsection II.B. (noting that *Raritan I* modified the third-party, negligent misrepresentation claim against an accountant into more of a general negligence claim). In addition, the second portion of this issue for which collateral estoppel is sought relates to the reliance element of Simpson's Count Twelve claim. While *a* reliance issue was resolved in *NCNB*, it was different from the one at issue in Count Twelve, and, thus, collateral estoppel does not apply to that element of Simpson's claim. As to the issues of material falsity and reliance, Simpson's Motion for Partial Summary Judgment is DENIED.

**16.** Count Two alleges a violation of § 10(b) and Rule 10b–5 related to DH & S's preparation and initial dissemination of its RIPA certifying SRC's 1986 financial statements, while Count Six claims that, through the same conduct, DH & S violated § 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r.

under Count Two. *See Ernst*, 425 U.S. at 214, 96 S.Ct. at 1391 (ruling that negligence did not provide a basis for liability under § 10(b) and Rule 10b–5). Because the identity of issues required to trigger collateral estoppel is not present as to the issue of reasonable care in *NCNB* and scienter for Count Two, Simpson's Motion is, in that respect, DENIED.[17]

Simpson also asserts that there is an identity of issues as to material falsity between Counts Two and Six and *NCNB*. However, as noted above, a finding of material falsity cannot definitively be drawn from *NCNB*. *See supra* note 15. In addition, under the federal claims, material falsity is measured by a "reasonable investor" or "reasonable shareholder" standard. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1133 (D.Or.1984). Since *NCNB* involved a lender, rather than an investor or shareholder, the identity of issues is broken. As a result, even if a determination of material falsity was made in the state court case, it cannot be applied collaterally here.

### D.

North Carolina's general requirements for collateral estoppel are thus satisfied only as to the issue of reasonable care raised by Count Twelve. However, before *NCNB*'s determination of this issue can be given collateral effect in a non-mutual, offensive manner, considerations of equity and efficiency must be evaluated.

Under North Carolina law, collateral estoppel can only be applied outside its traditional context if it is determined after careful consideration that such action is fair to the party defending the claim. *See Tar Landing*, 64 N.C.App. at 244, 307 S.E.2d at 185. The United States Supreme Court has stated that the essence of this fairness analysis should be the determination of whether or not the party against whom collateral estoppel is sought had a full and fair opportunity to litigate the relevant issue. *See Parklane*, 439 U.S. at 331, 99 S.Ct. at 651–52. As Simpson points out, DH & S had a strong incentive to litigate aggressively the issue of reasonable care because a significant amount of money was at stake. A review of the *NCNB* record as reported by the North Carolina Court of Appeals confirms that DH & S in fact devoted significant time and resources to the defense of the claim on which it ultimately lost. All indications support a finding that DH & S had a full and fair opportunity to litigate the issue from which collateral effect would now extend.

DH & S contends that the *NCNB* judgment is somehow internally inconsistent and therefore an inappropriate candidate for collateral application. *See generally Parklane*, 439 U.S. at 330–31, 99 S.Ct. at 651–52. While DH & S was found not liable for most of the claims asserted by NCNB, all of these claims involved different circumstances for certain issues, primarily whether NCNB reasonably relied on DH & S's audit and audit opinion regarding SRC. Because a basis other than inconsistent rulings exists to explain the *NCNB* verdict, this Court declines the invitation to label a state court jury verdict which has been affirmed on appeal as internally inconsistent.

DH & S next argues that *NCNB* likely represents a compromise verdict and that application of such a judgment collaterally would be unfair.[18] Defendant DH & S has cited no authority under North Carolina law which supports the notion that a judgment of the sort rendered in *NCNB* is less worthy of

---

17. Even if it were determined that *King's* requirement of identical issues was satisfied on this point, collateral estoppel would not be proper on this issue because no judicial resources would be conserved. *See Tar Landing*, 64 N.C.App. at 244, 307 S.E.2d at 185. Forcing the parties to litigate only the difference between negligence and recklessness, would likely complicate rather than simplify the proceedings.

18. This assertion is based on the fact that liability was assigned on only one claim in a multiple-count suit and that damages were reduced because the jury found that NCNB could have mitigated the damages which it suffered. *See supra* note 13.

respect than any other judgment. The North Carolina Court of Appeals, in affirming the verdict, expressly found that the jury's decision was supported by the evidence. In sum, no equitable considerations weigh against the non-mutual, offensive application of *NCNB*'s ruling on reasonable care to this case.[19]

Finally, it is determined that considerations of judicial economy support non-mutual, offensive application of collateral estoppel on the issue discussed above. The key consideration in this regard is whether Simpson could have easily joined in the prior proceeding. *See Parklane*, 439 U.S. at 330–31, 99 S.Ct. at 651–52. Collateral estoppel should be denied to parties who knowingly fail to intervene in proper situations, because to apply the doctrine under those circumstances would reward persons who stand on the sidelines waiting for favorable signals before pursuing their nascent claims, and thereby encourage splintered litigation and inefficient allocation of judicial resources. In this case, however, such intervention was not practically available to Simpson because his suit was a class action focused largely on federal securities issues and it was thus not compatible with NCNB's suit in state court. Therefore, non-mutual, offensive application of collateral estoppel does not create perverse incentives in this case, but actually saves judicial resources by narrowing the number of issues which must be presented to the jury.

### IV.

Defendant DH & S's Motion for Partial Summary Judgment is DENIED. Count Thirteen is DISMISSED. Plaintiff Simpson's Motion for Partial Summary Judgment is GRANTED as to the issue of reasonable care raised by Count Twelve, but DENIED in all other respects.

### ORDER

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith,

IT IS ORDERED that Defendant DH & S's Motion for Partial Summary Judgment is DENIED.

IT IS FURTHER ORDERED that Count Thirteen is DISMISSED.

IT IS FURTHER ORDERED that Plaintiff Simpson's Motion for Partial Summary Judgment as to the issue of reasonable care under Count Twelve is GRANTED.

IT IS FURTHER ORDERED that Plaintiff Simpson's Motion for Partial Summary Judgment is, in all other respects, DENIED.

---

19. DH & S has not argued that it would be entitled to any greater procedural advantages in federal court than it received in state court and thus, that potential equitable factor will not be considered.